No. 23,151.

WILLIAM J. STRONG, *Appellant*, v. THE SONKEN-GALAMBA IRON & METAL COMPANY, *Appellee*.

### SYLLABUS BY THE COURT.

1. COMPENSATION ACT—*Hernia—Refusal of Operation—Release of Employer from Further Liability.* The unreasonable refusal of an injured employee to permit a surgical operation where the danger to life from the operation would be very small, and the probabilities of a permanent cure very large, justifies a court in refusing compensation under the workmen's compensation law from and after the trial.

2. SAME—*Unreasonableness of Refusal of Operation a Question of Fact.* The unreasonableness of the refusal of an injured employee who is seeking to recover compensation under the workmen's compensation act, to permit an operation to be performed, is a question of fact to be determined from the evidence.

3. SAME—*Total Incapacity of Workman Not Shown.* There was testimony to support the finding that the injured employee was not totally incapacitated.

4. SAME—*Employer Not Estopped to Question Correctness of Award.* An employer is not estopped to question the correctness of an award

made under section 16 of chapter 226 of the Laws of 1917 by paying the amount found due at the time the award is made where the award provides for weekly payments thereafter.

5. SAME—A review of an award of an arbitrator appointed under the workmen's compensation act may be had where there is only partial disability after a short period of total disability, and the award gives compensation for total disability for the full period of eight years.

Appeal from Wyandotte district court, division No. 3; WILLIAM H. MCCAMISH, judge. Opinion filed May 7, 1921. Affirmed.

*James L. Hogin,* and *Roy R. Hubbard,* both of Kansas City, for the appellant.

*E. S. McAnany, M. L. Alden,* and *T. M. Van Cleave,* all of Kansas City, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: The plaintiff is seeking to recover compensation under the workmen's compensation law. Compensation for future incapacity was denied him in the district court. An arbitrator had been appointed who awarded the plaintiff compensation in the sum of $10.65 per week from November 20, 1918, to October 25, 1919, aggregating $515.26, less $15, making due $500.26 at the time of the arbitration and awarded as compensation thereafter $10.65 a week in weekly payments for the full period of eight years.

The arbitrator found that William J. Strong sustained an injury which produced a hernia that totally incapacitated him from work; that the hernia could probably be cured by a surgical operation; that at the time of the hearing before the arbitrator, the defendant tendered to the plaintiff an operation, and offered to pay all necessary expenses, including hospital bills and surgeon's fees, with the privilege of the plaintiff's selecting his own surgeon to perform the operation; that the offer was refused; that probably one operation out of a thousand for such hernias as the plaintiff was suffering from would result fatally; and that about twelve per cent of the operations for like hernias would not result in a cure. The arbitrator found as a matter of law that the plaintiff was not required to undergo a surgical operation, and that his refusal

Strong v. Iron & Metal Co.

to be operated on at the expense of the defendant furnished no reason or justification for the termination of compensation.

On December 5, 1919, the defendant paid into the office of the clerk of the district court the sum of money awarded and found due at the time of the arbitration, and on that day filed a petition to review the award. The plaintiff afterward filed an application to enforce the award. These proceedings were consolidated and tried together, and by stipulation they were heard on the evidence that had been submitted to the arbitrator. The court made findings of fact and conclusions of law as follows:

"The plaintiff received an injury on the 13th day of November, 1918, which injury arose out of and in the course of his employment with defendant, and that said plaintiff is entitled to compensation to be paid by defendant.

"That the injury to plaintiff as proved to be a recurrence of a right inguinal hernia; that the cause of said hernia was, originally, congenital, but the disability from which plaintiff now suffers was produced by the accident which occurred while plaintiff was moving iron for defendant as alleged by plaintiff.

"That said hernia has incapacitated plaintiff for work. The evidence is not clear, but the court finds that the temporary total disability of plaintiff resulting from said accident and injury was not to exceed five (5) weeks from November 13, 1918, and that such temporary total disability has been followed by partial disability, which partial disability will be permanent unless removed by surgical operation.

"The court finds that defendant has offered and still offers plaintiff a surgical operation, by surgeon of his own choosing, and to defray all expenses thereof. That plaintiff refuses said operation and that his refusal is unreasonable; that the operation would not be attended with danger to plaintiff's life, but would, in all probability result in a complete removal of present disability, as well as the congenital weakness which induced hernia.

"That the chances for recovery are so fair and the danger so slight that an ordinary person would readily submit to the operation.

"That plaintiff's average weekly wage prior to the accident was $17.75; that he was and is entitled to 60 per cent thereof for four weeks.

"That plaintiff during his partial disability has been able to earn the sum of $5.25 per week (approximately thirty per cent of prior wages), and is therefore entitled to recover sixty per cent of $12.50 or $7.50 per week during partial disability.

"That six months would be a reasonable time in which plaintiff should submit to and recover from the effects of a surgical operation.

"That plaintiff was and is entitled to compensation for four (4) weeks, in the year 1918, to compensation for 53 weeks in the year 1919, and to

22 weeks in 1920, to May 26th, 1920, together with six per cent interest.

*    *    *    *    *    *    *    *    *    *    *    *

"The court concludes, as to matters of law:

"That plaintiff is entitled to judgment against defendant for temporary total disability to date for $42.60; for partial disability to date, 75 weeks at $7.50 per week $552.50; in the aggregate lump sum of $595.10. Also interest on amounts from respective dates when due, in the sum of $————.

"That the plaintiff should endeavor to effect a cure of his condition by submitting to the operation as tendered by defendant and, in case of his failure so to do, his compensation shall cease at the end of 25 weeks, after May 26, 1920, and during said 25 weeks, beginning June 2, 1920, defendant shall pay plaintiff compensation in the sum of $7.50 per week, in weekly installments.

"Should plaintiff accept the tendered operation, defendant shall pay in addition to the operation, expenses, compensation weekly in the sum of $10.60 per week during the time the operation renders plaintiff totally incapacitated, and $7.50 per week for the remainder of the said 25 weeks, after June 2, 1920.

"In case the operation proves successful, the compensation. shall cease with said 25 weeks; but if plaintiff's disability is not thereby removed, compensation should then become due and payable at the rate of $7.50 per week for the remainder of the period of eight years as provided by law, either in a lump sum or in payments as the court may determine, and jurisdiction should be retained for the purpose of determining the length of time the operation results in total incapacity, whether or not the plaintiff is restored by the operation, and compensation ceases; if not, whether compensation shall thereafter be paid per week or in a lump sum and any other matters necessary for determination; such jurisdiction to be exercised upon motion of either party upon proper notice.

"That the defendant is not estopped from maintaining this proceeding."

Judgment was rendered accordingly, and from that judgment the plaintiff appeals.

The plaintiff gave the following as his reasons for refusing to have the operation performed:

"I think I am too old. I am 54 years of age. That is one reason, another is that I do not think I could stand it under my present age and condition. A man has to be perfectly healthy to undergo an operation and have it successful. I am not in condition because I was jammed through here (indicating). By jammed through here, I mean my ribs was pulled away from my breast bone and my spine is numb. That happened when I was thrown into the car. Another reason that I do not want to submit to an operation is that there is a chance of a man not living. I heard Dr. Stemen testify and say there was a chance of losing."

Strong v. Iron & Metal Co.

1. The principal question presented is, Did the court have power to reduce the amount of compensation that should be paid to the plaintiff if he refused to submit to an operation?

The principle which the defendant seeks to have applied has been recognized in actions to recover damages for personal injuries. (Note to *Donovan v. New Orleans R. & L. Co.*, in 48 L. R. A., n. s., 110-113; Note, 12 N. C. C. A. 591; 6 Thompson's Commentaries on the Law of Negligence, § 7210.) This rule was applied in this state in *Brewing Co. v. Duncan*, 6 Kan. App. 178, 57 Pac. 310, where that court said:

"The next allegation of error is that the court withdrew from the jury all evidence as to the probable result of a surgical operation. This we think was error, as the probabilities of a cure of the disability would to some extent affect the amount of damages. This should have been allowed to go to the jury and be weighed by them in assessing the amount of the recovery, as should also the probable-expense attending such an operation. This is not in mitigation of damages, but is a proper method of showing the actual damages sustained. If the plaintiff could be certainly cured by an operation that was safe and inexpensive, the injury would surely be less serious than one for which there was no hope; and to the degree that the certainty, safety, and inexpensiveness of a cure could be assured, in such a degree would the actual damages decrease." (p. 181.)

The present proceeding is not an equity case, but two of the oldest principles in equity jurisprudence are that, "He who seeks equity must do equity" (21 C. J. 172), and "He who comes into equity must come with clean hands." (21 C. J. 180.) This is but another way of saying that he must do right who seeks to compel another to do right.

In a "Digest of Workmen's Compensation Laws in the United States and Territories, with Annotations, sixth edition, revised to December 1, 1919," published by the Workmen's Compensation Publicity Bureau, is found a tabulated resumé of the statutory provisions contained in the workmen's compensation acts of the several states of the American Union. This digest shows that in the following states the workmen's compensation laws provide for the reduction, suspension, or rejection of compensation for the unreasonable refusal of an injured employee to accept medical treatment, or to submit to a surgical operation, or for persisting in unsanitary practices which retard recovery: Alabama, California, Idaho, Illinois, Indiana, Mississippi, Nebraska, Nevada, New Jersey,

New Mexico, Oregon, Pennsylvania, Porto Rico, Tennessee, Texas, Virginia, and Wyoming. Why were these provisions placed in the workmen's compensation laws of these states? There is but one answer, and that is because their legislatures thought that the principles there enacted into law were right.

In England and Scotland it is held that if an injured employee unreasonably refuses to submit to an operation he is not entitled to compensation. (*Donnelly v. Baird & Co., Ltd.,* 1 B. W. C. C. 95; *Warncken v. Richard Moreland & Son, Ltd.,* 2 B. W. C. C. 350; *Paddington Borough Council v. Stack,* 2 B. W. C. C. 402; *Wheeler, Ridley & Co. v. Dawson,* 5 B. W. C. C. 645; *O'Neill v. John Brown & Co., Ltd.,* 6 B. W. C. C. 428; *Walsh v. Locke & Co.* (*Newland*), *Ltd.,* 7 B. W. C. C. 117; *Dolan & Son v. Ward,* 8 B. W. C. C. 514; *Wright v. Sneyd Collieries, Ltd.,* 8 B. W. C. C. 537.)

In *Donnelly v. Baird & Co., Ltd.,* 1 B. W. C. C. 95, the Lord Justice-Clerk used the following language:

"I hold it to be the duty of an injured workman to submit to such treatment, medical or surgical, as involves no serious risk or suffering, such an operation as a man of ordinarily manly character would undergo for his own good, in a case where no question of compensation due by another existed." (p. 100.)

Lord M'Laren said:

"I can see no general principle except this, that if the operation is not attended with danger to life or health, or extraordinary suffering, and if according to the best medical or surgical opinion the operation offers a reasonable prospect of restoration or relief from the incapacity from which the workman is suffering, then he must either submit to the operation or release his employers from the obligation to maintain him." (p. 102.)

A workman's compensation case in which an injured employee claimed compensation for hernia, is *Schiller v. Baltimore & O. R. Co.,* 112 Atl. 272, decided December, 1920, where the supreme court of Maryland said:

"It was vigorously contended by appellant that one should not, as a condition precedent to continued compensation during disability, be required to submit to an operation the result of which might be fatal even if such result is so unlikely as to make the danger practically negligible. To support this contention he has cited but three authorities, all being New Jersey cases: *Newbaker v. New York, Susq. & W. R. R. Co.,* 38 N. J. Law, 175; *McNally v. Railroad Co.,* 87 N. J. Law, 455, 95 Atl. 122; *Feldman v. Braunstein,* 87 N. J. Law, 20, 93 Atl. 679.

Strong v. Iron & Metal Co.

"The overwhelming weight of authority is opposed to this view, holding that a man cannot continue to receive compensation and at the same time refuse to submit to proper medical or surgical treatment such as an ordinarily reasonable man would submit to in like circumstances." (p. 276.)

In another hernia case arising under the workman's compensation law of Michigan (*O'Brien v. Albert A. Albrecht Co.*, 206 Mich. 101) the supreme court of that state used the following language:

"The physician of the company and the one of plaintiff's selection both advised an operation for the hernia. Such operation is not attended with danger to life or health, and it appears to be undisputed that it affords the only reasonable prospect of restoration of plaintiff's capacity to labor at his trade, that of a carpenter. Without it he may be able to labor at such light occupation as the condition of his feet and ankles will permit, but he cannot do heavy lifting as his trade of carpenter requires. During all the time he has refused and still persists in his refusal to submit to the operation advised by his own physician as well as the one in the employ of defendant. Plaintiff is an intelligent man, and whether such refusal is due to a defect of moral courage or not we are unable to say. The board did not find that his refusal was due to any ignorance or misunderstanding on his part and no such finding would be justified on this record. . . .

"We appreciate the timidity with which the average person contemplates an operation, minor as well as major. But we also appreciate that in thousands of cases, operations, many of them of but minor degree, have restored incapacitated men to the army of wage earners, and put them in position to discharge their duty to their dependents, themselves and to society. We are impressed that under the undisputed evidence in the case it was the plaintiff's duty to accept the tendered operation. His unequivocal refusal to follow the advice and judgment of both physicians with reference to the operation relieved defendants from further activities in that direction, and, for the time being at least, absolved them from liability." (p. 104.)

The same principle was followed by the supreme court of Wisconsin in *Lesh v. Illinois Steel Co.*, 163 Wis. 124, where that court said:

"Where, as in this case, the applicant under the Workmen's Compensation Act unreasonably refuses to undergo a safe and simple surgical operation which is fairly certain to result in a removal of the disability and is not attended with serious risk or pain and is such as an ordinarily prudent and courageous person would submit to for his own benefit and comfort, no question of compensation being involved, the disability which the claimant suffers thereafter, a reasonable time being allowed for recovery, is not proximately caused by the accident, but is the direct result of such unreasonable refusal.

"No question of compelling the applicant to submit to an operation is involved. The question is: Shall society recompense a workman for a disability caused by his unreasonable refusal to adopt such means to effect a recovery as an ordinarily prudent person would use under like circumstances and which would result in the removal of the disability within the rule as stated above? It is true that the compensation awarded under the terms of the act is not damages in the technical sense, and that the rules relating thereto are not to be applied in cases arising under this act, and cases have been cited simply for the purpose of showing that damages accruing as a direct result of the claimant's unreasonable refusal to submit to reasonable medical and surgical treatment, where the results are fairly certain, were not even in tort cases held to be proximately caused by the accident.

"The proposition that an applicant, under the provisions of this humane law, may create, continue, or even increase his disability by his willful, unreasonable, and negligent conduct, claim compensation from his employer for his disability so caused, and thereby cast the burden of his wrongful act upon society in general, is not only utterly repugnant to all principles of law, but is abhorrent to that sense of justice common to all mankind." (p. 131.)

Neither Maryland, nor Michigan, nor Wisconsin has any statute authorizing the refusal, reduction, or suspension of compensation to an injured workman who refuses to submit to an operation. A number of annotators have cited cases on this question. (6 N. C. C. A. 390, note on Hernia and Varicocele under Workmen's Compensation Acts; 6 N. C. C. A. 675; 10 N. C. C. A. 185; 15 N. C. C. A. 79; 18 N. C. C. A. 669; L. R. A. 1916 A, 387; Ann. Cas. 1915 D, 482; 6 A. L. R. 1260.) The last note, however, is on "duty of injured employee to submit to operation or to take other measures to restore earning capacity." Cases might be cited from states having statutory restrictions on the right of an injured employee to recover compensation where he refuses to submit to an operation; but it is thought that the reasoning in those cases, while broad enough to include the present discussion, may have been based upon the statutory provisions and would therefore not be very persuasive in this state where there is no such statute.

Why should the plaintiff permit an operation to be performed? It might not result in his improvement; it would be painful; it is remotely possible that it might result in his death. Many if not most of the ordinary activities of men are painful in a sense; the man who works hard all day until his muscles cry for rest, and the man who goes into the field when

the temperature is from ninety to one hundred and five and works under the direct rays of the sun, endure sensations that are as unpleasant and many times are as unbearable as pain. They are pain, but of a kind different from that caused by wounded flesh.

Danger to life is everywhere, at all times; it cannot be escaped by any one. The most trifling accident to the person or the smallest scratch on the skin may result in death. The locomotive engineer and his fireman, when they climb into the cab of their engine and start on their trip, constantly face dangers that may, and often do, result in their death; the miner who goes into the earth, to take therefrom ore or mineral, faces death every day. These men are not deterred by danger, although they know that injury or death is liable to come at any time. They go because that is their field of labor, and it is their duty to go.

One of the greatest blessings that God has given to men is the ability to work, to work with hand and head and heart. Work produces happiness; refusal to work produces misery. Whatever of happiness there is in the world is the result of hard work. Whatever has been attained by man has been done by hard work, and the greatest achievements have been produced by the greatest efforts. In art, literature, science, and in all industrial enterprises, the greatest achievements have been accomplished by the hardest labor. The last ounce of energy of which the person laboring was capable of putting forth has been what has produced the desired result. It is a man's duty to himself, to his family, to society, and to God— to work, to work hard, to work with all his might, to accomplish in his lifetime all that it is possible for him to accomplish, to keep his mind and body in such a condition as will enable him to do his best, and to avoid everything that will detract from any of his powers or prevent him from accomplishing his utmost. If misfortune overtakes him in any way, and that misfortune detracts from his ability and renders him less able to work, mentally or physically, and the effect of the misfortune can be removed, it is his duty to do the thing that will restore him, even if there is pain and danger. There is no law to compel a man to perform any of these duties, but nevertheless they exist.

The state goes to great expense to fit its people for work, to protect them in their work, and to secure to them the result of their labor. Then if a man who receives these favors from the state will not work, he at least is not a good citizen.

The plaintiff has been injured. The injury can be remedied, and he can be restored to his former condition. It is his duty to do whatever is necessary to restore him. If he refuses to perform that duty, he should not ask the state nor any person to assist him in that refusal. He cannot be compelled to undergo an operation, but he can be told that if he refuses he shall not receive compensation for that which he voluntarily continues.

2. The reasonableness of the refusal of an injured employee to submit to an operation has been considered in most if not all the cases where he has been denied compensation on account of such refusal. That reasonableness has been disposed of in those cases as a question of fact. It is a question of fact that must be determined by the trier of facts, and when he has determined it, and his conclusion is supported by evidence, that conclusion is binding on this court the same as the determination of any other question of fact. In the present case the district court tried the fact of the reasonableness of the refusal of the plaintiff to permit an operation. The court in substance found that the plaintiff's refusal was unreasonable.

3. The plaintiff argues that "there was no testimony to support the court's finding and judgment that the appellant was not totally incapacitated." The finding was not made as thus indicated, but in substance it amounted to that. The plaintiff testified:

"I have not been able to do any work of any kind since I had the accident, except I did a little work on a neighbor's automobile. I did no lifting and it took me two weeks to get it done, and I was paid ten ($10.00) dollars. I helped to make a fence. I stapled the wire; I did none of the heavy work; I was paid five ($5.00) dollars for that. That is all of the work I have been able to do and all I have earned since the accident. I cannot do manual labor because I am injured through my shoulders and arms, and the rupture I cannot get a truss to hold it up and keep it up properly. Have not been able to. When I try to work I do not have the strength I had before, and I suffer pain."

One physician testified, "I think he could do light work without any trouble and without any danger of increasing these hernias." Another physician testified, "I think this man could do light work very nicely with the aid of a truss and without

danger." That evidence was sufficient to support the finding of partial disability after the period of total disability expired, and to support the finding that the plaintiff was able to earn $5.25 a week, "approximately thirty per cent of prior wages."

4. The plaintiff contends that the defendant is estopped to question the correctness of the award by reason of its having paid the $500.26, the amount found due by the arbitrator at the time the award was made. The statute, section 16 of chapter 226 of the Laws of 1917, under which this proceeding was instituted, in part reads, "At any time before the final payment has been made under or pursuant to any award or modification thereof agreed upon by the parties, it may be reviewed by the judge of the district court having jurisdiction." This statute provides for a review of the award after payments have been made under it. The defendant is not estopped to question the correctness of the award.

5. The plaintiff challenges the power of the court to review the award of the arbitrator on the ground that the statute provides for such review for the following reasons only:

"That the award has been obtained by fraud or undue influence or that the committee or arbitrator making the award acted without authority or was guilty of serious misconduct or that the award is grossly excessive or grossly inadequate, or that the incapacity or disability of the workman has increased or diminished." (Laws 1917, ch. 226, § 16.)

The plaintiff cites *Roper v. Hammer*, 106 Kan. 374, 187 Pac. 858. That case does not control here for the reason that the statute authorizes a review of the award where the amount given is grossly excessive. In its petition to review the award, the defendant alleged, "that since the tender of said operation and its refusal by claimant, the defendant says all payments directed to be made thereafter for total disability are grossly excessive, and the award of sums after the refusal of the tender is without authority on the part of the arbitrator." Compensation for total disability, $10.65 a week, was awarded. The court found that there was no total disability, but that there was partial disability, and that the plaintiff was entitled to recover $7.50 a week during partial disability. This amounted to a finding that the award of the arbitrator was grossly excessive, and brought the proceeding within the statute authorizing a review of the award by the district court.

The judgment is affirmed.

WEST, J. (dissenting) : After about twenty-five years of European experiment, this country began to enact workmen's compensation laws. In 1884, Germany by an accident insurance act began the change which has thus developed. Maryland enacted a statute of this kind in 1902, followed by Montana in 1909, and New York in 1910. Ours was passed in 1911. In Germany seven hundred thousand accidents with ten thousand fatalities occurred annually. The situation was less startling than in the United States 'where there were from two million to three million accidents with from twenty-five thousand to thirty thousand fatalities. (The Americana, Vol. 29, p. 520.)

"The great object of the workmen's compensation acts is to shift the burden of such economic waste from the employee to the industry, in order that it may ultimately be borne by the consumer as a part of the necessary cost of production." (Kiser's Workmen's Compensation Acts, 8.)

These cases are regarded as coming within the police power of the state, it being held that their tendency is to raise the general standard of the people and to diminish the liability of injured workmen becoming public charges. (*Id.*, p. 15.)

Sixteen states and Porto Rico are named in the majority opinion as having provided by legislative enactment for the reduction, suspension or rejection of compensation for unreasonable refusal to accept medical treatment or to submit to surgical operation. But our statute, with all its detail and all its amendments, although providing expressly for medical examination and refusal thereof, is utterly silent as to the duty of the employee to submit to a surgical operation as a condition precedent to receiving compensation. Hence, all the decisions in states which have covered this matter by legislation could be of no avail on the question here.

In 1916, twenty-five states had already enacted compensation acts. (21 New International Encyc. 228.) Very few of the courts of these states have had this question before them. The matter of compensation covered by our statute has nothing whatever to do with damages for injury in the ordinary acceptance of that term, and, hence, such decisions as *Brewing Co. v. Duncan*, 6 Kan. App. 178, 51 Pac. 310, have no application. Cases are cited from Michigan, but the reason is not apparent, for in *Andrejwski v. Wolverine Coal Co.*, 182 Mich. 298, it was

held that the compensation act of that state was in derogation of the common law, requiring strict construction, which is diametrically opposed to our decisions and to our statute which expressly provides that such statutes shall be liberally construed to promote their objects. (Gen. Stat. 1915, § 11829; *Wall Paper Co. v. Perkins,* 90 Kan. 725, 136 Pac. 324.)

In the cited Schiller case, where the writer of that opinion said that the overwhelming weight of authority is opposed to· this view, one of the cases going to make up this overwhelming weight is *United Rwys. & Elec. Co. v. Dean,* 117 Md. 686, which upon examination turns out to be an action for injury brought by a passenger against a railway company.

Numerous decisions, including some of those cited in the foregoing opinion, treat hernia as a very trivial matter. Inguinal hernia is an escape of a portion of the intestine into the inguinal canal. The known dangers are congestion, inflammation and strangulation. Strangulation is well understood to be a most serious and dangerous condition, the per cent of fatalities being very large. The modern operation for inguinal hernia is to make an incision, close the walls of the inguinal canal as nearly as possible, and unite by suture.

In an article by Dr. Joseph A. Blake, in volume 5 of the Reference Handbook of the Medical Sciences, published in 1915, going most learnedly and extensively into the subject of hernia, after describing the various modern operations for inguinal hernia, this language is used:

"As a rule children under four years of age and adults over fifty should not be operated upon, inasmuch as many children are cured by the wearing of a truss, and in the aged the hernia can be controlled by truss with less inconvenience than in the younger and more active, while the dangers of operation are greater." (p. 219.)

The plaintiff testified he was fifty-four years old; that in pushing a wheelbarrow loaded with two or three hundred pounds of iron the runway broke and threw the wheelbarrow full of iron to the bottom of the car, and plunged him headlong so that he struck with all his weight on the upturned edge thereof, striking him in the lower abdominal region; that he had a rupture when he was a boy about eight years old which healed up when he was about twelve and he wore a truss until he was about twenty-one, and had never had any trouble about doing any heavy work since. He said he had no particular

surgeon he had confidence in, and was not willing to choose a hospital or surgeon and be operated on.

"My particular reason for refusing to do so is that I think I am too old. I am 54 years of age. That is one reason, another is that I do not think I could stand it under my present age and condition. . . . I am not in condition because I was jammed through here (indicating). By jammed through here, I mean my ribs was pulled away from my breast bone and my spine is numb."

Doctor Stemen testified that the plaintiff had a large inguinal hernia; that the percentage of successful operations by the best doctors runs from eighty to ninety per cent.

"An operation for inguinal hernia, such an operation as the person here possesses, is a major operation, and attended with some danger. I mean there is always some danger with the anæsthetic, and always some danger of streptococcic infection, but the dangers are very very minute. I would say they have 999 chances out of a thousand of getting well, but I qualify that by saying there is always some danger. . . . The danger of an operation depends upon the individual. Shock and fear have a great deal to do with an operation. . . . The chances of a complete recovery in such an operation as would be necessary in Mr. Strong's case are affected somewhat by the person's age. The cases of complete recovery are greater in young people than in older people and in the case of a man 54 years of age the percentage of chances of complete recovery is much less than it would be in the case of a younger person."

Doctor Gray testified that the plaintiff's heart had some defect in the aortic valves. Doctor Lowman, who had performed three or four hundred hernia operations, on cross-examination said:

"About ten per cent of the hernia operations are not complete successes. This is partly due to the individual conditions. Part of it is due to infection, and part of it is due to poor quality of gut and the breaking. All kinds of things may occur in a surgical operation, even with the most extreme care."

The legislature, which since 1911 has been making provisions for the recovery of workmen's compensation, has gone into detail in minutiæ and said that one injured in the course of his employment shall receive compensation. It has with apparent studiousness avoided any such condition precedent as a refusal to submit to a surgical operation.

That a man like the plaintiff with no family, or one with a wife and children dependent upon him, must be barred from the benefits of the act and thereby become in a greater or less degree a public charge, and thus bring on the very condition

this legislation was confessedly made to avoid, is a startling declaration.

Even the British courts, followed by the very few tribunals which in the absence of statute have taken the view of the matter so ably stated by the majority opinion, have spoken almost apologetically, as an examination of the cases of *Warncken v. Richard Moreland and Son, Limited,* 100 L. T. Rep. 12; *Tutton v. Owners of Steamship Majestic,* 100 L. T. Rep. 644; *Binns v. Kearley and Tonge, Ltd.,* 6 B. W. C. C. 608, 611; and *Walsh v. Lock and Co. (Newland), Limited,* 110 L. T. Rep. 452, will show.

With the eloquent eulogy on industry I agree, if industry be considered merely in contradistinction to idleness. But we are told in the sacred account of the creation that after the fall it was said to Adam—

"Because thou hast hearkened unto the voice of thy wife, and hast eaten of the tree, of which I commanded thee, saying, Thou shalt not eat of it: cursed is the ground for thy sake; in sorrow shalt thou eat of it all the days of thy life; thorns also and thistles shall it bring forth to thee; and thou shalt eat the herb of the field: in the sweat of thy face shalt thou eat bread, till thou return unto the ground; . . ." (Genesis iii, 17, 18, 19.)

I am not ready to believe that the fallen state of our first parents was better than their primal innocency, that thorns and briers are better than flowers and fruits, that The Man With the Hoe has a more desirable life than one with means of leisure, or that incessant toil is the *ultima Thule* of human existence. Nothing has more thoroughly marked the progress of social economics and modern legislation than the belief that there should be time for recreation and cultivation of the intellectual, emotional and spiritual elements of our nature, and such leisure is more to be desired than a treadmill, galley-slave life or a self-imposed immolation upon the altar of hard work.

Our workmen's compensation act was passed in order that employees receiving injuries arising out of and in the course of their employment should not have to resort to lawsuits or to be compelled to suffer without remedy, and that the consumers in paying for the products should have added to their cost a sum sufficient to justify the employer in paying a reasonable compensation. This was in order that the injured workman might have the means of livelihood and not become a pauper to be

supported by the public. The scheme involves no loss to the employer, because it assumes that he will fix the price of his products so as. to save himself from any sacrifice whatever. And why should he be rewarded by the public by being permitted to withhold compensation because a workman suffering with inguinal hernia does not at the age of fifty-four feel·safe in submitting to a surgical operation?

This class of legislation is in its infancy. The progress of ·events in relation thereto is all in one direction. Where the legislature has been silent, the courts should also be silent. If a prophecy might be ventured it would be that before this generation shall have passed the decisions followed and announced by the few courts constituting the present small numerical majority will not only be repudiated but will be pointed to with anything but pride.

But we are told that—

"The state goes to great expense to fit its people for work, to protect them in their work, and to secure to them the result of their labor. Then if a man who receives these favors from the state will not work, he at least is not a good citizen." (Ante, p. 126.)

I do not like the paternalistic ring of these words. The state does nothing for "its people." The people do things for themselves through the instrumentality of "their state." They are under no load of gratitude to the state for laws which their own chosen representatives have enacted. The state has gone to no expense at all in providing compensation for the plaintiff. It does not pay or promise to pay him one cent. His employer has simply been authorized to charge enough more for its out-. put to compensate him when disabled in the line of duty. His good citizenship does not depend on his submitting to what Doctor Steman pronounces a major operation in order to receive what the legislature has provided for him without such submission. As a good citizen he is. to be commended for asking what his own representatives have declared he may receive in case of disablement in the course of his employment, on the exact terms laid down. No duty rests on him to add to those plain terms a dangerous condition precedent and thereby run the risk of adding himself to the number of those whose earning capacity is destroyed by death or diminished by helpless infirmity.

It is hard to believe that courts have hanged witches, sentenced men to death for shooting hares, and in effect told injured employees when asking for safe places to work that they would quit or starve.   Indeed the ancient and even comparatively recent disregard of the law for life and limb and human comfort is almost unbelievable.   But be it said to the credit of the law that in all these matters we are in a new dispensation. Let us not go back to the old.