70 So.2d 179 (1954)
FRENCH
v.
EMPLOYERS MUT. LIABILITY INS. CO. OF WISCONSIN.
No. 8103.
Court of Appeal of Louisiana, Second Circuit.
January 26, 1954.
Rehearing Denied February 16, 1954.
Writ of Certiorari Granted March 22, 1954.
Jackson, Mayer & Kennedy, Shreveport, for appellant.
Godfrey & Edwards, Many, for appellee.
AYRES, Judge.
This is a workmen's compensation suit, wherein the plaintiff seeks recovery of compensation at the maximum rate for total and permanent disability against the principal's compensation carrier, less weekly payments made from the date of injury, August 3, 1951, through November 29, 1952.
In the District Court, judgment was rendered in favor of plaintiff as prayed for but ordering plaintiff to submit to a corrective operation, within sixty days of the finality of the judgment, for the removal of a torn semilunar cartilage from his left knee, and providing, in the event that he failed to do so, the defendant was authorized to discontinue further compensation payments.
An application for a rehearing was filed and urged in the District Court; on trial thereof, a rehearing was granted; and, on rehearing, judgment was again rendered in plaintiff's favor as prayed for but omitting the provision requiring the plaintiff to submit to an operation.
From the judgment, the defendant prosecutes a suspensive and devolutive appeal to this Court.
*180 The defendant has interposed the following defenses:
(1) That plaintiff has fully and completely recovered from any and all injuries which he may have sustained and is fully capable of performing all of the duties of his former occupation and those of other similar, reasonable and gainful occupations for which he is properly fitted by his previous training and experience;
(2) In the alternative, if plaintiff is suffering any disability whatsoever, this disability is limited and restricted to a minor loss of the use and function of his left knee, which can be completely eliminated by minor surgery which defendant has recommended, tendered and offered the plaintiff, and which plaintiff has arbitrarily and unreasonably refused.
Plaintiff, on August 3, 1951, while employed by J. C. French, a sub-contractor of the Louisiana Long Leaf Lumber Company, as a log hauler driving a truck and loading and unloading logs, sustained an injury to his left knee during the process of unloading his truck at the principal's sawmill. The logs were being lifted from the truck with tongs and placed in a pile some ten to fifteen feet high. Plaintiff ascended the top of the pile of logs to detach the tongs, which had become fastened, and while descending his left leg jammed between two logs and he fell sidewise, twisting and injuring his knee.
The defendant, in this court, does not seriously urge its defenses other than its alternative demand. We have thoroughly studied the record and given full consideration to the testimony dealing with plaintiff's employment, accident, injury and disability, and particularly the evidence of the medical experts, and our conclusion is that the trial judge reached the correct conclusion that plaintiff was totally and permanently disabled within the purview of the compensation act to do and perform the work that he was doing at the time he was injured, or work of similar character.
The proposition of submission to a surgical operation is one which must in the final instance be determined by the employee, that is, he has the option of submitting or of refusing to submit to the tendered operation. It is only in the event of the refusal of an employee to submit to a tender of surgical procedure that the matter becomes a question of judicial concern, and then there devolves upon the court the responsibility for this determination. The Court, in the light of the facts and circumstances of each particular case, must decide whether the refusal of the employee has been arbitrary or unreasonable. Benefield v. Zach Brooks Drilling Co., La.App., 59 So. 2d 710, 711.
We are fully aware of the fact that the courts are reluctant to require injured litigants to submit to surgical operations as a condition precedent to payment of workmen's compensation, and with that principle we are in full accord. Martin v. Wyatt Lumber Co., 4 La.App. 157; Yarbrough v. Great American Indemnity Co., La.App., 159 So. 438; Bronson v. Harris Ice Cream Co., 150 La. 455, 90 So. 759; Simmons v. Blair, 194 La. 672, 194 So. 585, 586; Fredieu v. Mansfield Hardwood Lumber Co., La.App., 53 So.2d 170, 174.
It was urged in the Wyatt case, supra, that under no conditions or circumstances has an employer the right to ask that an injured employee submit to an operation at the employer's expense or else forego compensation. The court rejected that argument in this language:
"To so hold would be equivalent to saying that an injured employee has the right to wilfully, arbitrarily and without reason or excuse, prolong his disability, destroy his usefulness to the state and society, deprive his dependents of support, and make himself a charge upon the community.
"Such conduct on the part of an injured employee would be in violation of every consideration of duty and good citizenship.
"To hold that an employee has the right to destroy his own usefulness by wilful neglect or refusal to accept simple *181 and harmless treatment, as a means for recovery, tendered him at the expense of his employer, in order to obtain compensation, would be violative of the dictates of reason, common sense and good conscience, and would set the stamp of approval upon the conduct of the malingerer.
"It is true that our workmen's compensation statute does not specifically require that an injured employee shall submit to medical or surgical treatment; nevertheless it is well settled that an injured person must do what he can, within reason and safety, to minimize the damage. It has been so held in personal injury cases by all the courts, including the United States Supreme Court.
"See Donovan v. N[ew] O[rleans] Ry. & L. Co., 132 La. 239, 61 So. 216 [48 L.R.A.,N.S., 109], and authorities there cited."
However, as was stated in Fredieu v. Mansfield Hardwood Lumber Co., supra [53 So.2d 174]:
"However, we can conceive of cases, such as the one before us, where the surgical operation is so relatively simple and the advantages to be procured thereby are so nearly certain, that the complainant should be required to undergo such. If the operation does not bring about the hoped-for results, very little, if any harm will have been done."
See also Bronson v. Harris Ice Cream Co., supra.
In Johnson v. United States Fidelity & Guaranty Co., La.App., 58 So.2d 261, 263, 264, this Court, through Judge Gladney as the author of the opinion, said:
"The following cases outline rather fully the reasons for compulsory submission, although the first two cases were decided in favor of the employee: Reeves v. Dietz, Orleans, 1925, 1 La. App. 501, 503; Crawford v. Tampa Inter-Ocean S. S. Company, La.App. Or., 1934, 155 So. 409; Fredieu v. Mansfield Hardwood Lumber Company, La.App.2d Cir., 1950, 53 So.2d 170.
"In Reeves v. Dietz, supra, the court therein quoted these words from Strong v. Sonken-Galamba Iron & Metal Company, 109 Kan. 117, 198 P. 182, 186, 18 A.L.R. 415:
"`The state goes to great expense to fit its people for work, to protect them in their work, and to secure to them the result of their labor. Then if a man who receives these favors from the state will not work he at least is not a good citizen.
"`The plaintiff has been injured. The injury can be remedied, and he can be restored to his former condition. It is his duty to do whatever is necessary to restore him. If he refuses to perform that duty, he should not ask the state nor any person to assist him in that refusal. He cannot be compelled to undergo an operation, but he can be told that if he refuses he shall not receive compensation for that which he voluntarily continues.'
"The Reeves case also recited the reasoning in Donnelly v. Baird & Company, Ltd., 1 B.W.C. 95, an English decision, saying:
"`* * * I hold it to be the duty of an injured workman to submit to such treatment, medical or surgical, as involves no serious risk or suffering, such an operation as a man of ordinarily manly character would undergo for his own good, in a case where no question of compensation due by another existed. * * *
"* * * I can see no general principal except this, that if the operation is not attended with danger to life or health, or extraordinary suffering, and if, according to the best medical or surgical opinion, the operation offers a reasonable prospect of restoration or relief from the incapacity from which the workman is suffering, then he must either submit to the operation *182 or release his employers from the obligation to maintain him.'
"In the Crawford case Judge Janvier pointed out that where an order is requested for a corrective operation the order is an alternative one, and that the injured party, in any such case, is free without rhyme or reason to refuse to submit to surgical treatment, or in fact to refuse to submit to any treatment at all, or be penalized by suspension of compensation. It was recognized that any injured party must do all that he reasonably can to minimize his loss and that where an operation will be attended by only slight risk and will almost certainly be successful, it must be resorted to."
The issue herein in its final analysis is whether plaintiff's refusal was arbitrary and unreasonable. With the above principles in mind, we shall now proceed to a discussion and consideration of the facts and circumstances of this case. In its final analysis also, we are of the opinion that each case must be decided upon its particular facts.
From all of the testimony of the physicians and surgeons who testified in the case, it is established that the experts were in agreement that the injuries sustained by plaintiff consisted of a torn semilunar cartilage or medial meniscus and a torn medial tibial collateral ligament of the left knee joint. The end of the ligament, where torn from its attachment to the bone, had calcified in the process of healing for approximately one-half inch. This is known as Pellegrini-Stieda Disease, which as explained, is actually no disease at all, but is simply nature's abnormal way of repairing a torn ligament. This is described by Dr. F. J. Macpherson, wherein he gives a description of and the use and purpose of the ligament and the meniscus or semilunar cartilage:
"There was minimal calcification on the upper portion of the medial tibial collateral ligament, and I think we can explain thatthe knee joint, being primarily a big hinge joint, has a heavy ligament both on the inner side and outer side to assist in the side to side stability and runs from the end of the femur to the top of the tibia, and just where it attached to the lower end of the femur there is seen here some calcification which almost looks like bone, but it extends down just where the normal soft ligament would be, and we see this type of thing frequently following tears of the ligament in which hemorrhage occurs, and then due to persistent movement the hemorrhage disseminates out in the ligament and then nature instead of being kind and absorbing the blood and healing the ligament gets a little too over-exuberant about healing it and deposits calcium well, actually almost bony type of materialin the torn ligament, and this is such a common thing it has been described and carries the name of Pellegrini-Stieda Disease, which actually is no disease but is simply an abnormal calcification in a torn ligament.
"Also, in this front view of the knee, there is some narrowing of the inner joint space as compared to the outer joint space. This outer joint is narrower than the inner joint compartment.
"Q. Is that of any significance? A. It is very mildly suggestive. The meniscus or so-called semilunar cartilages of the kneewe have one in each compartmentset in the joint like a wedge under a door and tend to hold the joint separated and act as cushions, and when they are torn or split or out of place even we can see the joint surfaces come closer together. It is purely a suggestion in this particular case, that maybe something is wrong with the so-called medial semilunar cartilages."
Dr. Craig testified that the ligament had healed by metaplasia, "meaning instead of forming a new ligamentous tissue, it has calcified and is a bone formation."
We are further informed by his testimony, as well as by that of some of the other witnesses, that the ligament served as a supporting structure of the medial aspect, or the inside of the knee, and that the *183 semilunar cartilage acts as a gliding surface over which the femur and thigh bones act on above and the leg bones, tibia and fibular, particularly the tibia, glide over from below, and that when the cartilage is torn, the ordinarily smooth surface is not present, and at times, due to stiffness in the joint, the joint locks, making it difficult to extend or flex the knee. Pain often results from an injury of this kind, and continues whenever the rough surface and broken cartilage and ligaments fail to function properly.
There are no material differences in the medical testimony relative to the nature of the operation proposed, and as to plaintiff's need and as to the recommendations therefor.
The usual operation for the removal of a torn semilunar cartilage was described by Dr. Macpherson. He stated:
"The usual operation is done under tourniquet, to prevent bleeding during the operation, and which increases visibility and speeds up the operation considerably, and makes a clean complete job a lot easier. The incision is usually a so-called medial parapatella incision laid just on the inside of the kneecap over the front of the joint. We have to cut through the skin and then the sheath and then the capsule of the joint and then the thin synovial lining and then we can look in the joint and hold it open with retractors and inspect the whole inner cavity. If the meniscus is found to be torn it is usually dissected free at the front and grasped with a strong holding type of clamp; its front attachment is then cut down and then by dissection around with a blunt nosed instrument. * * *"
The other surgeons, Dr. Caldwell and Dr. Oxford, who are also orthopedic surgeons, as well as Dr. Hargrove and Dr. Craig, who are specialists in internal medicine, agree with Dr. Macpherson on the operative procedure. The operation is, therefore, not a serious or a prolonged operation, the testimony showing that in the usual case the actual operation itself consumes only fifteen to twenty minutes.
Dr. Macpherson was of the opinion that the calcification of the ligament only represented a minimal part of plaintiff's disability, and that he had reached maximum improvement and would not get any further calcification in the ligament.
The witness continued by saying:
"A. * * * Under observation from that period of timefrom August, 1951, to January, 1953I would say that he will not get any further calcification in that ligament, but the persistence of the symptoms, the persistence of the atrophy of the thigh, suggests that he is still having difficulty with his medial meniscus and that he will continue to have it and if this torn or detached meniscus isn't removed he will probably get some degenerative arthritic changes in the knee.
"Q. What conclusion did you reach with respect to the man's ability to perform manual labor in the condition in which you found him? A. Well, this man in attempting to do heavy manual labor in which he would be required to squat and stoop and rotate on his knee would certainly advance the degenerative changes in his knee and would probably precipitate him into locking and tearing of the meniscus and medically speaking it would not be good for him. It is possible, physically, for him to do some of this work but he may get in serious trouble the first day he tried, and he would be in danger of sustaining not only injury to his knee but possibly other injury to himself."
The doctor's testimony with reference to an operation for the removal of the medial meniscus was as follows:
"Q. What was your recommendation in this case? A. I recommended that this man have his medial meniscus removed.

*184 "Q. You would have no hesitancy as an orthopedic surgeon to perform such a procedure on this man? A. No, sir.
"Q. You would expect to get good results, would you not? A. Yes, sir.
"Q. You would not anticipate that you would be jeopardizing his life, would you? A. No, sir. No more than the usual risk of anesthesia.
"Q. Putting it another waythe usual risk attendant upon a general anesthetic would not cause you to refrain from operating on this man's knee, would it? A. No, sir.
"Q. Would such an operation subject him to severe pain and discomfort? A. These people hurt for about three days.
"Q. They have about three days of moderately severe discomfort, is that correct? A. Yes, sir.
"Q. Following that what is the postoperative history? A. Rapidly diminishing discomfort and pain.
"Q. Ambulatory in how long? A. We try to ambulate these people on crutches about the third or fourth postoperative day.
"Q. And discard the crutches in about how long? A. Just as quickly as he can, when he feels secure usually within the first ten days to two weeks.
"Q. You have, have you not, performed this operation and returned the man to manual labor? A. Yes, sir.
"Q. And you anticipate recovery and return to manual labor in what length of time? A. In seven or eight weeks at the most this man should be able to do well.
"Q. Do you know of any reason why surgery shouldn't be performed on this joint? A. No, sir.
"Q. Would you expect to improve his condition? A. Definitely, yes, sir. We should diminish his pain and his buckling and his thigh should enlarge and we should very definitely diminish the rate of development of the degenerative arthritic changes.
"Q. If I told you this man made his living working as a truck driver hauling pulpwood do you believe you could fix him up so that he could go back to that kind of work? A. Yes, sir.
"Q. This surgery you referred to is a well established much used procedure, is it not, sir? A. It is, yes, sir.
"Q. I believe in your report of January 5th to Mr. John Godfrey you report a minimal calcification of this medial tibial collateral ligament, is that correct, sir? A. Yes, sir, that term is used. I think we can qualify it in that we have seen the entire length of the ligament calcified quite heavily and densely. As a matter of fact we have seen both the inner and outer calcified the entire length.
"Q. This gentleman had the kind of calcification that is customarily found following an injury of this type, is that correct? A. Yes, sir.
"Q. It isn't uncommon to find it? A. Well, it is a little uncommon, but it isn't surprising, let us say.
"Q. Now, we as laymen have inquired into the niceties of what you found there and probed into it in such a way as to try and spread out in the record your opinion in regard to the minute details of the condition you found, but do I understand it is your testimony that as a whole, taking into consideration the calcification of the ligament, the possible tear of the semilunar cartilage and all other factors that you observed as an expert physician, you felt that you could work on him and return him to active manual labor, is that correct, sir? A. Yes, sir."
*185 As to the calcification of the ligament, the doctor stated that of plaintiff's 15% disability, only 1 or 2 percent of that disability was due to that calcification, and that his real trouble was in his medial meniscus.
Dr. Oxford testified with reference to the calcification of the ligament and the disability resulting therefrom, as follows:
"Q. Did you feel when you last saw him that the calcification of the tibial collateral ligament had matured? A. Yes, sir, it was stationary.
"Q. Do you think that the presence of such calcification, separate and apart from the tear of the meniscus, would cause any disability at all in the knee? A. Well, very little, if any.
"Q. Would it cause such disability as to prevent the man from carrying on his duties as a laborer? A. No, sir.
"Q. Does the presence of the calcification alone once it has matured give rise to any continuing pain and discomfort? A. No, sir."
With reference to such an injury, the doctor testified relative to the recommendation for and the results of an operation and post-operative history, as follows:
"Q.What would you as an orthopedic specialist anticipate would be the result of that type of surgery? A. It usually gives an excellent functional result.
"Q. Do you perform this procedure in your practice, the excision of a torn medial meniscus? A. Yes, sir.
"Q. Is it a well recognized and much used procedure? A. Yes, sir.
"Q. Do you in your professional opinion feel that to subject the patient to such an operation jeopardized his life? A. No, sir.
"Q. Does it subject the patient to undue hardship in the nature of severe pain and suffering? A. No, sir.
"Q. In your professional opinion are those operations reasonably sure of success? A. Yes, sir.
"Q. What is the postoperative history of such surgery by way of convalescence? A. They are usually in the hospital three or four days and then on crutches about two weeks, and a laboring man is as a rule able to go back to work in two or three months. Some of them much sooner.
"Q. Then it has been your experience that you can do that particular type of surgery and return a man to hard manual labor? A. Yes, sir."
Similar testimony was given by Dr. Caldwell:
"Q. Now, Doctor, you have told us you recommended surgery for correction of a torn similunar cartilage of the knee? A. Yes, sir.
"Q. Is this a well worked out and much used procedure? A. Yes, sir, it is.
"Q. Is a general anesthetic required? A. Yes, sir.
"Q. In your practice, Doctor, approximately how many operations of this kind have you performed? A. Oh, at a guess, 250 to 300.
"Q. What kind of success have you had on the whole with them? A. Very good.
"Q. Does the operation jeopardize the life of the patient? A. I don't believe so, no, sir.
"Q. Does it subject him to undue pain and suffering? A. Not undue. They have pain for three or four days.
"Q. Could the operation be reasonably expected to eliminate the disability referable to the knee joint? A. Yes, sir.
"Q. In an operation of this kind what is the usual postoperative history, *186 so to speak, Doctor? A. They are walking on crutches the day after the operation; usually in the hospital three or four days; gradually resume weight bearing on the operated extremity; and the patient usually walks into the office in about ten days for removal of the sutures and they usually walk in without a crutch or cane; the knee remains swollen for three or four weeks, and with continued weight bearing and exercises the knee on the average reverts to a normal state in a maximum time of three months.
"Q. Do you find that patients upon whom you have performed this operation are able to resume hard manual labor or not? A. They are able to, yes, sir.
"Q. In your practice do you know of any individual or individuals who have been able to perform manual labor notwithstanding a torn cartilage? A. Yes, sir.
"Q. What type of labor have you seen a man do with a torn cartilage? A. I remember one specifically who had been working as a roughneck in the oil fields with a torn cartilage that locked frequently that came in during his vacation time to have it taken out because he said he was tired of putting up with it, but he had worked continuously for three or four years as a roughneck and with no loss of time, and he returned to his same occupation after removal of the cartilage. More recently, on Monday of this week, I operated on a man who had been working continuously, I believe for the Stanolind Oil Company, with the same difficulty in his knee that he said he had four or five years.
"Q. And you expect him to recover and go on back to his usual and customary duties, is that correct, sir? A. Yes, sir.
"Q. Now, Doctor, in your final diagnosis you have stated a finding of a disease which you have named Pellegrini-Stieda Disease. Will you tell us whether or not the fact of Mr. W. C. French in your opinion having that disease alters the expected outcome of the surgery in this particular individual? A. I don't believe it does, no, sir.
Plaintiff's physician, Dr. Craig, testified that he would expect plaintiff to have good results from an operation for the removal of the torn cartilage with the usual amount of disability that results in the removal of such cartilage; that with that kind of result, he was of the opinion that plaintiff could resume a normal way of life with reference to the work that he was doing. He also stated that he informed plaintiff that if Dr. Oxford recommended surgery, that he should submit to it and that from a physician's standpoint, he did not know of any reason why plaintiff should not undergo surgery for the correction of the condition of his knee, and that physically, he was of the opinion that plaintiff was a good risk for the operation. However, Dr. Craig was of the opinion that inasmuch as plaintiff had expressed a fear of an operation he should not be compelled to submit to one. From that standpoint he thought plaintiff would be a poor psychological risk for surgery. The other medical experts did not deem this or the fact that plaintiff had headaches such an important factor or as a determining factor in the matter.
The medical testimony convinces us the medial semilunar cartilage of the knee had been torn and that this accounts for plaintiff's major difficulty, causing his disability and pain. It does not appear that any serious complications have developed, although it is shown that the ligament at one end has calcified for about one-half inch, but that that condition has matured and from that he will not experience any difficuty. It is also made probable from the testimony that the disability arising from the condition of his knee will continue until and unless the recommended surgery for the removal of the semilunar cartilage is had.
From the testimony, too, we are convinced that the recommended operation involves no serious risk or suffering and *187 offers a reasonable prospect of restoration or relief from the incapacity from which plaintiff is suffering. It is our opinion, therefore, that unless some good reason is shown why the operation should not be performed, the Court should direct it to be done, subject, of course, to plaintiff's privilege to refuse to submit thereto under the penalty of foregoing further compensation.
Plaintiff contends that he has shown such reason. He testified:
"Q. Have you given the matter of the operation careful consideration? Have you thought about it seriously? A. Yes, sir, I sure have.
"Q. And have you discussed it with your familyyour wife? A. Yes, I sure have.
"Q. Mr. French, why have you refused the operation? A. Well, I'm just afraid of the operation. I just don't like to be cut on is the first thing, and then I'm just afraid of it. I haven't had any assurance it was gonna correct or cure my leg and I just don't want to be put to sleep.
"Q. Why do you have this fear of being put to sleep? A. Well, I have a terrible headachethis head trouble gets ahold of me every once in occasion, say every four or five weeks, and it knocks me out. I'm in bed two or three days at a time and I'm scared of being put to sleep and besides that they tell me the anesthetic makes you sick and they might put me to sleep and I wouldn't wake up.
"Q. Is that your fear, of the anesthetic? A. Yes.
"Q. Well, suppose they tell you this could be done under a general anesthetic, in the nature of a spinal injection? A. I would be just as afraid of that as being put to sleep. They tell me that puts you to sleep, you might say, just kills you all over.
"Q. Do you have that same fear of a spinal anesthetic as you do of ether or any other type of anesthetic that results in your going to sleep? A. Yes, sir, I'm afraid I might take one of them spells of headache and wouldn't wake up."
Plaintiff and his wife had discussed the proposed operation, and she gave as his reason for not accepting it: "Well, he has a fear of being operated on and then, I mean of the knife, and the fear of not awakening after being put to sleep."
The medical testimony convinces us that there is in reality no real or substantial basis for the refusal of the tendered operation, based upon what appears to be the usual fear and apprehension prevalent in the mind of the ordinary individual toward an operation. The medical testimony also convinces us that the headaches experienced by plaintiff furnish no substantial reason for the operation not being performed. All the orthopedic surgeons who testified were of the opinion that such would not militate against an operation.
Plaintiff further contends that the operation, if successful, would not fully restore the usefulness of his knee and leg and there would still remain a small amount of disability in the knee, caused by the removal of a part thereof which performed a useful function. This is a point for possible future consideration. We are convinced that by the removal of the torn semilunar cartilage, the pain suffered by plaintiff and the locking of the knee joint will be eliminated and that the function of the knee will be restored to normal, permitting and enabling plaintiff to again enjoy a useful and normal life and do the work he was doing at the time he was injured, and work of similar kind and character. This takes into consideration, too, that the operation will not remove the calcification of the torn ligament, which has healed, but which as shown by the testimony will continue to cause very little if any disability and no pain in the operation of the knee.
However, in the case of Fredieu v. Mansfield Hardwood Lumber Co., supra, 53 So. 2d page 174, the facts of which are very similar to plaintiff's case, it is stated:

*188 "Plaintiff relies heavily upon the case of Simmons v. Blair, supra, and the trial judge based judgment largely thereupon. In that case, as we have found herein, the disability was due to `a fractured internal semilunar cartilage' of the knee joint. However, in that case there were complications and injuries not present in the case before us. There the piece of cartilage, as found by the Court, `protrudes to the medial side of the knee joint causing a tumor mass or growth at that point.'
"We think the mentioned complications, etc. tender a different situation to that wherein disability is due to a small piece of cartilage being loose, but where no additional pathology is present."
The Simmons v. Blair case was, therefore, distinguished from the Fredieu v. Mansfield Hardwood Lumber Co. case, and in the same respect is distinguished from the case at bar. The Fredieu case involves, as this case does, the question of an operation for the rupture of a semilunar cartilage. This Court, in a very thorough and exhaustive opinion, held that plaintiff should submit to the operation for the relief of his disability. We are constrained to follow the reasoning of this Court in the Fredieu case as sound and as accurately stating the law applicable to this case.
Observation is made, too, that the plaintiff sustained the injury in the Simmons v. Blair case in 1937, and that the decision of the Supreme Court was rendered therein in 1940. Since that time, great strides have been made in medicine and surgery to lessen the danger in an operation and to expedite recovery, and altogether to make the operations more successful and satisfactory. Dr. Macpherson described this progress:
"This procedure was well established at the time I graduated. (1937) It was done primarily on football players. It carried a greater risk at that time because all surgery didanaesthesia, postoperative infection, just general good operating room techniqueand sterility can't be compared to what it is today, plus the fact that we now have anti-biotics, and in this particular procedure we now have a new drug called hydrocortisone which we are now putting in these joints postoperatively. It, like the cortisone in ACTH, will assist tissues in resisting infection and actual mechanical damage, and we feel it will speed up the convalescence in these people and reduce the adhesions and general damage to the joint. We think we have made good advancement particularly in joint surgery."
It is further observed, too, that plaintiff was given a very thorough physical examination to determine his fitness for the operation offered, and it would be presumed under the usual procedure preceding any additional operation that plaintiff's fitness therefor would be thoroughly determined before proceeding with such an operation, even one ordered by the Court.
The situation here is to be further distinguished from the situation in Johnson v. U. S. Fidelity & Guaranty Co., La.App., 58 So.2d 261 (which involved the question of an operation for a hernia) and all the cases involving abdominal operations, for the reason that in the case at bar, the operation involves only a limb, and it appears that any complication that might arise, if any, from an operation thereon could be more easily and more successfully dealt with and controlled than in an operation on the abdomen.
Plaintiff, a young man, in the prime of life, 40 years of age, is the head of a family, with a wife and four minor children, ages from 7 to 13 years, dependent upon him for support. His education is limited, and the only work he is capable of, or trained to do, is hard manual labor, such as he was doing at the time he was injured. To continue in his present condition, without recovery of ability to work, to the end of his compensation payment period, would find him at that time, and his family, no doubt, in destitute and necessitous circumstances *189 and perhaps an invalid. We feel that he owes it to himself and to his family to do what is reasonably necessary to restore himself to usefulness and not become a dependent upon society. The law contemplates that an injured employee is a normal individual desiring nothing so much as restoration to normal strength and usefulness, that God-given right to work, and that he will do nothing to create, continue or increase his disability by wilful or unreasonable conduct and thereby increase the burden upon society by reason of an unnecessarily prolonged disability.
We are convinced from all of the testimony in the case that plaintiff's condition can be corrected, if not completely cured, by a relatively simple operation; that such an operation is in no sense dangerous to life, or attended by unusual risk, and is reasonably sure of success, and that plaintiff is under a duty to submit to such operation, without cost to him, and by an expert of his choice, in order to correct and relieve his existing disability and in order to restore himself to a state of usefulness to himself, his family, and society.
For the reasons herein assigned, the judgment from which appealed is affirmed, with these modifications: That within sixty days from finality of this judgment, plaintiff will submit to an operation on his left knee by a competent orthopedic surgeon of his own selection, the expense of such, including hospitalization and incidentals in connection therewith, to be borne by the defendant.
In the event plaintiff refuses to submit to such operation, defendant shall have the right to discontinue making compensation payments subsequent to the expiration of said sixty day period.
Whether or not plaintiff will be entitled to demand compensation payments if he submits himself to such operation, after a reasonable time has elapsed, to determine whether the desired and expected results have accrued, is hereby left open and reserved to plaintiff.
Plaintiff is cast for costs of appeal; all other costs are assessed against defendant.