(No. 6196.   July 6, 1935.)

ALBERT CARLSON, Employee, Appellant, v. F. H. DE-ATLEY & COMPANY, Employer, and STATE INSUR-ANCE FUND, Surety, Respondents.

[46 Pac. (2d) 1089.]

J. H. Felton and E. A. Stellmon, for Appellant.

Erb & Erb, for Respondents.

GIVENS, C. J.—June 18, 1932, appellant suffered a concededly compensable hernia for which he received compensation from July 7, 1932, to September 25, 1932, and medical, surgical attendance and hospital service from the State Insurance Fund, paid without any hearing or order by the Workmen's Compensation Board. Thereafter, February 14, 1933, appellant applied for a hearing contending that he was totally disabled by reason in substance of defects in the operation. The Fund resisted the claim for compensation on the ground that if appellant was suffering any disability it was the result of other causes and not a result of the operation or anything connected therewith. A hearing was had April 13, 1933, and the Board granted compensation to

December 1, 1932, apparently upon the theory that appellant had not completely recovered from the immediate results of the operation until that time, but found as a fact that his then disability was the result of sciatic or gluteal and lumbar myalgia and not the hernia or operation. No appeal was taken from the order of May 2, 1933, made following the first hearing. Thereafter, December 26, 1933, appellant asked for a further hearing under I. C. A., sec. 43–1407. The Fund did not resist the application, though questioning the sufficiency thereof, and a second hearing was had February 28, 1934, when the Board again reaffirmed its previous holding and denied compensation. Such order was sustained on appeal to the district court and now brought before us on this appeal.

Appellant's principal contention is that the Fund in effect so acknowledged and accepted liability for compensation by paying to September 25, 1932, as to have cast upon it the burden of proving the cessation of compensable disability which they have not sustained, citing *Employers' Liability Assurance Corp. v. Coffman,* 147 Okl. 227, 296 Pac. 395; *Sanders v. Rock Island Coal Min. Co.,* 138 Okl. 45, 280 Pac. 290; *Brittain v. Department of Labor & Industries,* 178 Wash. 499, 35 Pac. (2d) 49; *Channing v. Payton,* 152 Okl. 153, 4 Pac. (2d) 1; *Matela v. Department of Labor & Industries,* 174 Wash. 144, 24 Pac. (2d) 429.

A careful review of these cases, however, discloses that the acknowledgment of liability for compensation, giving rise to the asserted rule, rested therein on more than payment. The Fund herein recognized the hernia as compensable and paid therefor and until it evidently considered appellant had recovered from the operation. That was not such an acknowledgment, however, of liability for or recognition of his subsequent or present disability as having arisen from or been caused by the operation as to cast upon the Fund the burden of proving they were entitled to cease payments.

In *Employers' Liability Assurance Corp. v. Coffman, supra,* the insurance carrier said in its brief: " . . . .

that as a result of the said injury the claimant became totally disabled . . . . '' and likewise in *Channing v. Payton, supra,* at page 3 the court said: ''However, we also have the admission that the accidental injury caused the disability in the first instance.''

No such admission has been made herein as to the present disability. *Sanders v. Rock Island Coal Min. Co., supra,* if anything, holds against appellant, the court saying:

''Payment does not estop the commission in making further orders; surely payment should not estop a review by this court of an original order of award made by the Commission. *Strong v. Sonken-Galamba I. & M. Co.,* 109 Kan. 117, 198 Pac. 182, 18 A. L. R. 415.''

To hold that payment alone would thus cast the burden of proof on the insurer as urged by appellant would injuriously affect the employee, as the insurer could not with impunity pay beyond the earliest date of immediate recovery without being subjected to such burden. No question as to the burden of proof as to the Board can arise as no burden of proof rests on the Board, although it should be and is an investigating body charged with the duty of seeing that the employee receives compensation when he is entitled thereto equally with not making an award against the insurer when there is no injury arising out of and in the course of the employment.

The sole question remaining is whether there is sufficient evidence in the record to sustain the Board's finding and conclusion that appellant's present disability did not result from the hernia or operation therefor, and to determine this we may look only to the testimony in the second hearing because while the Fund offered the testimony taken at the first hearing upon objection of appellant it was excluded by the Board.

Appellant contends his disability is caused by the inguinal ring being closed too tightly at the operation, thus pressing on the spermatic cord, resulting in pain in that region, swelling of the testicle, pains in the back and inability to perform the sexual act, walk or work.

Dr. Johnson, who assisted at the operation and who has been treating appellant during all of the period covered herein, testified on direct examination with regard to the effect of the operation on appellant's right testicle, pain and discomfort in that region, and resultant inability to work as follows:

"A. Well, it (inguinal ring) has to be closed tightly enough and still not be too tight, of course. The spermatic cord has to pass down through this ring, and if it is closed too tightly it causes constriction of the cord.

"Q. And that would cause swelling in the testicle, I take it?

"A. *Yes, it could.*

"Q. And if it is closed too loosely no cure results?

"A. There would probably be a hernia later.

"Q. But, now then, you have testified that from the time, or within a week of the operation, to the present time he has consistently complained of a soreness in the testicle and trouble with his sexual feelings on that side, has he not?

"A. He has not said anything to me about sexual feelings at all.

"Q. How about the testicle?

"A. Yes. He has complained with his testicle.

"Q. And you have examined that testicle, have you?

"A. Yes.

"Q. Have you found it in a swollen condition at certain times?

"A. Yes.

"Q. Now, what disability would this cause, if the inner ring were closed too tight and there was a constriction of this cord to the testicle?

"A. Well, it may be painful.

"Q. And how much of the side of the person would it affect?

"A. I don't know.

"Q. *Could it affect most of the side there with sympathetic pains?*

"A. I don't know.

"Q. It is problematic in the individual case?

"A. Yes.

"Q. Are the cases all the same upon the matter?

"A. No. Different people are different in that respect.

"Q. Then would you say that in the present case, although the proper care or proper technique was used, that probably the inner ring of the hernia had been closed a little bit too tightly and there has been a constriction there in the case of Albert Carlson?

"A. *Well, it could have been.*

"Q. It could cause his present symptoms and his present disability, couldn't it?

"A. *It could cause pain and swelling.*

"Q. What would be the cure for that?

"A. Well, I think in Albert's case if he will wait awhile it will probably gradually be relieved."

On cross-examination he testified as follows:

"A. No. I don't think his general condition has improved.

"Q. What would you say as to his being any worse?

"A. I don't know, it seems to me he is thinner than he was a year ago. Of course, I wouldn't say.

"Q. On the whole you would say his condition is the same now as it was when you testified a year ago?

"A. His physical condition, that is, is possibly not so good as it was a year ago, his general physical condition.

"Q. Now, you spoke about this operation and the inner ring. . If it was not properly closed, you say it might be painful?

"A. Yes.

"Q. There is no way to observe or tell that from examination at the operation, is there?

"A. You cannot tell whether it is painful or not.

"Q. And it would not incapacitate a person in work in any way, would it?

"A. *Oh, yes, it could.*

"Q. That would all depend on the degree of pain, wouldn't it?

"A. Yes.

"Q. Nobody could tell that, of course, excepting just what the claimant would say; in other words, there would be no objective symptoms to disclose that?

"A. Well, there could be objective symptoms along the cord and testicle.

"Q. Could you tell that by examination?

"A. Yes.

"Q. Did you find such a condition?

"A. Yes.

"Q. Did you find any different conditions there than you testified to a year ago?

"A. Now you mean at the present time?

"Q. Yes.

"A. I think that is better now."

Dr. Stockslager testified as follows in this regard:

"Q. Now, you have heard Dr. Johnson's testimony as to what happens in case that the inner ring is closed a little bit too tightly, have you not?

"A. Yes.

"Q. Do you agree with his opinion as to those matters?

"A. *Well, it could be, yes.*

"Q. And in your examination of Mr. Carlson did you find any other disease or condition that would create disability there?

"A. No I didn't.

"Q. And your opinion is approximately the same as to the symptoms as to the constriction of the cord and so on and the swelling of the cord as Dr. Johnson's, is it?

"A. I do. I didn't see him at the time his testicle was swollen.

"Q. I know you haven't seen him at the time, but I mean the closing too tightly of the inner ring while the operation is being performed would cause swelling of the testicle. Would that be one of the things that would cause that effect?

"A. *It could.*

"Q. Would that be painful?

"A. It would be apt to be, yes.

"Q. Would it be disabling?

"A. I imagine it would.

"Q. All right. You may take the witness.

"Cross-examination by Mr. O'Malley:

"Q. Now, Doctor, you couldn't tell from your examination you couldn't tell whether there is a closing of that inner ring or whether in the operation for hernia the inner ring was not properly closed, can you?

"A. *No, I cannot.*

"Q. And there would be no way to determine whether that condition existed without opening him up again?

"A. No.

"Q. And you have examined him recently?

"A. I did.

"Q. And from your examination you are not able to say whether the operation was not complete and perfect in every respect?

"A. No, I couldn't state."

Dr. Carssow testified for the respondents as follows:

"Q. What would you say, Doctor, as to his condition to-day in comparison with his condition at that time?

"A. I think it is very similar only he is somewhat better, I took two pictures of his teeth more than a year ago, and those were made in April, 1933. We took pictures of his teeth and his pelvis, and he has had three teeth extracted and his teeth are in much better condition than they were, that is, the pyorrhea is pretty well out of his mouth, but his condition is probably a little bit improved over last year, his general condition.

"Q. I believe that is all. You may cross-examine."

"Cross-examination by Mr. Felton:

"Q. Now, did you examine the operation scar for this last hernia?

"A. I did.

"Q. And you are familiar with these hernia operations, are you not?

"A. Yes.

"Q. What happens, Doctor, in the event that the inner ring is closed too tightly around the cord?

"A. Immediately he has pain. Remotely he would have atrophy of the testicle.

"Q. And would it also cause swelling of the testicle?

"A. Immediately. Remotely it would cause atrophy of the testicle.

"Q. And would that be at the time of exercise or when?

"A. It may be for some time after, but if you have a tight inner ring you will have atrophy of the testicle eventually.

"Q. In how long a time?

"A. Inside of a month.

"Q. If it had not happened to be closed tightly enough to atrophy, but just tight enough to constrict it?

"A. You cannot have a continued interference without atrophy.

"Q. Now, did you find any reason for his present disability?

"A. I did a year ago and if you—I made a diagnosis of gluteal and lumbar myalgia, and he had some calcareous deposit in the gluteal muscles, and a man who has once had myalgia will continue to have a chronic myalgia.

"Q. What is myalgia?

"A. Rheumatism of the muscles.

"Q. What was the cause of this rheumatism?

"A. Originally it was pyorrhea. After a certain period, why certain germs established themselves in the body and you continue to have it, I mean for a long time, and these germs that usually establish themselves are streptococcus.

"Q. In the event that he had been examined a few days ago by two licensed and competent physicians and surgeons, would that myalgia have been apparent to them upon such examination if it had existed?

"A. Oh, if it exists chronically it creates considerable disability.

"Q. Does it create disability all the time or does it recur?

"A. Oh, most of the time.

"Q. If it is present in a disabling form now it would be apparent upon examination a few days ago?

"A. Yes.

"Q. And if physicians examining him a few days ago did not find a condition, and examined him as to the cause of his present disability, what then would you state as to whether or not a myalgia exists at the present time?

"A. Read the question. (Question read.) The effects of myalgia will exist.

"Q. How long would the effects of myalgia exist?

"A. They will exist indefinitely in a way; for instance, your calcareous deposit will not be absorbed readily.

"Q. And could this have been caused by an accident, myalgia have been caused by an accident?

"A. *It is a possibility, but hardly probable.*

"Q. And a strain of the back muscles?

"A. No.

"Q. How long continued is chronic myalgia?

"A. There are certain types. There are certain types that they use a blocking cure for, that they have to give injections for a lifetime, and there are other cases that run a month, and other types that run six months and others five years and others ten years and so on. They are variable.

"Q. You examined him a few days ago, did you not?

"A. Yes. On January 15th.

"Q. And did you find a myalgia at that time?

"A. He was complaining then of pains in his back.

"Q. Complaining. Did you find it?

"A. Yes. I did. You find it just as much as you can find it any time."

The most that can be gained from the testimony of Doctors Johnson and Stockslager is that the pressure in the inguinal ring *could* have caused the pain and discomfort in the leg. There was a marked lack of definiteness in their evidence that the condition now existing was actually caused by pressure at or in the ring. Dr. Carssow testified that appellant's disability and trouble was caused by infection

and that if there were pressure in the inguinal ring the testicle would atrophy, which it had not done in this case, and that rheumatism was the cause of the present condition. A fair consideration of all of this evidence brings this case within the rule announced in *Mell v. Larson*, 54 Ida. 754, 36 Pac. (2d) 250. And while there is a conflict in the evidence it is sufficient to sustain the finding of the Board as affirmed by the district court that the disability is not the result of an accident but of other causes not connected therewith. (*Scarborough v. Beardmore, ante*, p. 229, 41 Pac. (2d) 290, and cases therein cited.) Appellant cites *Matela v. Department of Labor & Industries, supra*, in favor of his contention but there one of the physicians testified unequivocally that the condition was due to the injury and not the result of disease. No such situation obtains here.

Even though the evidence is in equipoise the appellant may not recover because the burden was on him to show a present compensable disability. (*Walker v. Hyde*, 43 Ida. 625, 253 Pac. 1104; *Hawkins v. Bonner County*, 46 Ida. 739, 271 Pac. 327; *Larson v. Ohio Match Co.*, 49 Ida. 511, 289 Pac. 992; *Vaughn v. Robertson & Thomas*, 54 Ida. 138, 29 Pac. (2d) 756; *Wells v. Robinson Construction Co.*, 52 Ida. 562, 16 Pac. (2d) 1059; *Dunnigan v. Shields*, 52 Ida. 195, 12 Pac. (2d) 773.)

There must be a probable and not possible connection between the cause and effect. (*Croy v. McFarland-Brown Lumber Co.*, 51 Ida. 32, 1 Pac. (2d) 189; *Strouse v. Hercules Min. Co.*, 51 Ida. 7, 1 Pac. (2d) 203; *Reinoehl v. Hamacher Pole & Lumber Co.*, 51 Ida. 359, 6 Pac. (2d) 860.)

The conclusion reached on the merits renders it unnecessary to further pass on the more technical point urged by respondent that the hearing was limited to the question of change of condition, assertedly not shown.

The judgment is therefore affirmed. Costs to respondent.

Budge, Morgan, Holden and Aïlshie, JJ., concur.