(No. 6373. February 25, 1937.)

J. V. WOZNIAK, Respondent, v. STONER MEAT COM-
PANY, Employer, and STATE INSURANCE FUND,
Surety, Appellants.

[65 Pac. (2d) 768.]

Judgment of district court *affirmed.*

Carroll F. Zapp, for Appellants.

Elam & Burke, for Respondent.

AILSHIE, J.—Respondent, a young man twenty-three years of age at the time of the hearing in this case, was first employed by appellant, Stoner Meat Company (to which we will hereinafter refer as the company), in 1931 to help install an ice machine, having had previous experience in that work while in his father's butcher-shop. The company needed someone to keep the "machinery in running order," and "the fellows that worked out there didn't seem to be able to do the work and keep it running properly." The period of his employment continued until some time in April, 1935. During the intervening years respondent worked at various jobs with at least eight other companies, installing and repairing refrigerator plants and doing other work.

In July and August, 1934, respondent assisted in installing a refrigerating plant for the company at Ontario, Oregon; in October he installed another ice machine for the company and in November he worked on a shift, boning meat. During December of that year he boned meat for the I. E. R. A. Most of these odd jobs were of short duration, four or five days. During the entire time respondent worked on the ice machines he used litharge in connection with the work.

Litharge is used as a pipe cement which is applied to the threads in the pipe and on the inside of the fittings. Respondent testified to using four or five batches (two or three tablespoons each) of litharge a day in working on an ice machine. Sometimes in "working overhead in a place that is hard to get at," the litharge would run off and drop on his face. In pipe fitting respondent often applied the litharge with his hands. Litharge is a fused form of lead protoxide, chemically designated as "PbO." (Dorland's Med. Dictionary.) It was supplied to the workman in commercially powdered form, and in order to use it in his work it was necessary to first mix it with glycerin, so as to form a sticky paste that would adhere to the pipes on which he was working. It is difficult to handle it in the powdered form without inhaling some of it: this is perhaps its most dangerous form

for handling. (6 Schneider's Work Comp. Laws Supp., p. 1273.) In handling it in any form some of it will necessarily stick to the hands and in that way may very easily get into the mouth and be swallowed. It is also believed by recognized authorities that it can be absorbed through the pores of the skin.

Prior to this illness respondent had always been in excellent health. Prior to October, 1934, his use of litharge had been intermittent and of no material consequence. He had never heard of anyone getting ill from working with litharge or the use of lead in any way until this sickness.

During the latter part of January or early February, 1935, respondent used litharge in working for the Booth Fisheries Company. For about three weeks in April, 1935, he worked for the company in moving an ice machine. He became ill and suffered pains in his stomach and bowels, had dysentery, and later suffered a numbness in his hands and feet and was nervous and depressed. He consulted a physician about the middle of that month and was later hospitalized from July 22d to October 19th. About a week or two before entering the hospital respondent was notified by his physician that he "thought" he "had lead poisoning but he wasn't sure." Later the doctor determined that he had a case of acute lead poisoning.

From a judgment of the district court, reversing an order of the Industrial Accident Board, denying compensation to plaintiff, this appeal is taken.

While lead poisoning is a recognized "occupational disease," inhering in and resulting from work in certain occupations (*Industrial Com. of Ohio v. Roth,* 98 Ohio St. 34, 120 N. E. 172, 6 A. L. R. 1463, and notes to latter), it does not appear, from any evidence in this case, that it is common to or inheres in the character of work the employee was engaged in. Nor does it appear that his injury is the result of "a disease developed in the usual and ordinary manner by reason of and because of the occupation in which" he "was engaged." (*Crowley v. Idaho Industrial Training School,* 53 Ida. 609, 26 Pac. (2d) 180; *Industrial Com. v. Roth, supra.*)

It is admitted, however, that he *suffered from lead poisoning.* There is no substantial evidence to show that he suffered

this lead poisoning from any previous engagement or employment, or that his condition was chronic or resulted from prolonged contact with lead oxides. On the other hand, it does appear that he used litharge containing lead oxide in course of his employment with appellant company; and that the most reasonable hypothesis to be drawn, from the facts and circumstances of his employment and his subsequent illness, is that the poisoning came from working with and using the litharge in the course of his latest employment with the company. The evidence indicates strong probabilities that claimant was poisoned by the litharge which he used in installing and working on the ice machines and plants for the company; and that his poisoned condition is the result of an accident which occurred in course of the employment. The law does not exact certainties; it acts upon probabilities. (*Adams v. Bunker Hill etc. Min. Co.*, 12 Ida. 637, 89 Pac. 624, 11 L. R. A., N. S., 844; *Beaver v. Morrison-Knudsen Co.*, 55 Ida. 275, at p. 277, 41 Pac. (2d) 605.) In respect to the happening of the accident, we consider this case ruled by *Ramsay v. Sullivan Min. Co.*, 51 Ida. 366, 6 Pac. (2d) 856; also, *Crowley v. Idaho I. T. S.*, *supra*.)

We are unable to find any evidence that would support the finding of the board, that this workman is suffering from "gradually absorbing into his system lead oxide in the course of the occupation followed by him during the four years last preceding and which absorption had gradually accumulated sufficient lead in his system to cause the polyneuritis to develop sufficiently so the symptom suddenly became manifest and disabled the claimant while he was tearing out and reinstalling the two ice machines in the plant of the defendant, Stoner Meat Company."

The judgment of the district court should be affirmed, and it is so ordered. Costs are awarded to respondent.

Morgan, C. J., and Holden and Givens, JJ., concur.