(No. 6647.   April 19, 1939.)

LILA OLIVE GOLAY, Respondent, v. GUY STODDARD and MAGIC HOT SPRINGS, a Corporation, Appellants.

[89 Pac. (2d) 1002.]

Rayborn, Rayborn & Smith, for Appellants.

Chapman & Chapman and Lionel T. Campbell, for Respondent.

HOLDEN, J.—Respondent Lila Olive Golay was employed as a cook at the Magic Hot Springs Cafe, a health resort located about forty miles south of the City of Twin Falls, in Twin Falls county. At about 4:30 o'clock in the afternoon of September 27, 1937, while on her way into the cafe to cook supper, as she was attempting to pass through the doorway, her foot slipped and her body in the sacroiliac region was in some manner twisted and injured. Her claim for the injury thereby suffered, was heard at Twin Falls, September 6,

1938. September 22, 1938, the board made and filed its findings of fact and conclusions of law, entering the following award thereon: "Wherefore it is ordered, and this does order, that Lila Olive Golay be, and she hereby is, awarded against the defendants, Guy Stoddard and Magic Hot Springs, a corporation and each of them, the sum of $58 as reimbursement for expenses incurred and the additional sum of $447.03 as compensation for disability for work," from which the defendants appeal to this court.

Appellants contend respondent failed to prove by a preponderance of the evidence, she suffered a personal injury by accident arising out of and in the course of her employment, in that it is insisted the accident occurred at about 9:00 P. M., after working hours, and not at about 4:30 in the afternoon, as claimed by respondent. On the issue as to when the accident occurred, respondent testified on direct examination:

"Q. Now, on or about the 27th day of September, 1937, what happened to you out there?

"A. Well, I was coming from the store back to the cafe. We were beginning to get supper and I stepped upon the—up to the door and I kind of slipped and went right kind of back and put my arms out to help myself and I felt a catch in my back and took sick at that time.

"Q. Did you fall to the ground?

"A. My foot slipped back on the porch.

"Q. You went down?

"A. Not exactly.

"Q. After that slip or fall were you able to do any work?

"A. No.

"Q. What did you do there after you fell?

"A. Well, I didn't—it didn't bother me until about two hours later and I noticed it. It hurt me worse then and I had to go to bed.

"Q. How long did you stay in bed at the Magic Hot Springs?

"A. I was in bed four days before I came home."

On cross-examination she testified:

"Q. I believe you told Mr. Chapman you got hurt about four o'clock or four-thirty?

"A. I got hurt at four-thirty.

"Q. Tell me just how the accident occurred?

"A. Well, there is a door step about this high off the porch and as I stepped up on there I slipped back and slipped off and I caught myself between the two sides of the door to keep myself from falling and it caught my back. I don't know how I twisted my back.

"Q. Was the door step wet?

"A. I don't know.

"Q. Was anyone with you?

"A. No.

"Q. You were by yourself?

"A. I was coming into the house.

"Q. You didn't fall at any other time?

"A. No."

.   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Wasn't this about nine o'clock in the evening?

"A. No.

"Q. Could not have been after dinner?

"A. No.

"Q. You didn't go to the bath house and take a bath and it wasn't when you were on your way back from that that you slipped?

"A. No.

"Q. You are sure of that?

"A. Yes."

Mrs. Melvin Reiher, a witness for appellants, testified she was working at the Magic Hot Springs Cafe, September 27, 1937, she and respondent had gotten dinner, and later, about nine o'clock they went out and took a bath; that "We decided to get a drink of ice water. I went in first and was standing in the cafe and turned the light on and as she went to open the door—there is an ice box there where the ice melted and it runs across the steps and she went to open the door and slipped on that water and she went like this and threw herself to keep from falling, and then she came in the cafe and we got a drink and went to bed."

Respondent and Mrs. Melvin Reiher were the only witnesses who testified as to when the accident occurred. It will

be noted respondent testified she was alone at that time. Mrs. Melvin, Reiher, however, testified she was present and witnessed the accident, and that it occurred at about nine P. M. Appellant Stoddard testified respondent told him the next day the accident occurred at nine o'clock P. M. the day before.

The burden was upon respondent, as urged by appellants, to prove she suffered a personal injury by accident arising out of and in the course of her employment. (*Brooke v. Nolan*, 59 Ida. 759, 87 Pac. (2d) 470; *Croy v. McFarland-Brown Lumber Co.*, 51 Ida. 32, 1 Pac. (2d) 189; *Larson v. Ohio Match Co.*, 49 Ida. 511, 289 Pac. 992; *Hawkins v. Bonner County*, 46 Ida. 739, 271 Pac. 327; *Walker v. Hyde*, 43 Ida. 625, 253 Pac. 1104.)

The Industrial Accident Board is an administrative and fact-finding body, exercising special judicial functions. (*Pierstorff v. Gray's Auto Shop*, 58 Ida. 438, 450, 74 Pac. (2d) 171.) It determined, and we think correctly, respondent proved her claim to compensation by a preponderance of the evidence. In the first instance, before the board, a claimant must so prove his right to compensation. On appeal, where there is a substantial conflict in the evidence as in the case at bar, the findings of the Industrial Accident Board will not be disturbed. (Constitutional Amendment, article 5, section 9, 1935 Session Laws, page 377.)

Appellants also contend, as we understand them, that the evidence simply shows it is *possible* respondent suffered an injury to, or in the region of the sacroiliac joint, and not that she *probably* was so injured. On that question David R. Johnson, a Doctor of Chiropractics, and a witness in behalf of respondent, testified as follows:

"Q. Are you acquainted with Miss Golay, the claimant here?

"A. I am.

"Q. Did you have occasion to treat her during the month of October, 1937?

"A. I did.

"Q. What did you ascertain to be her condition at that time and for what did you treat her?

"A. Lila had a bad—the muscles in the lower part of her spine were very badly contracted and also on the leg, pulling her weight over on one side and she walked bent over on one side when she came to me."

"Q. How long did you treat her?

"A. I gave her twenty-nine adjustments altogether.

"Q. Over what period of time?

"A. From the first of October until along the latter part of April."

"Q. In April when you quit giving her these treatments, what was her condition?

"A. Her condition had improved considerable but there was still a tension in the muscles in the back on one side.

"Q. Which side?

"A. I do not remember.

"Q. That condition existed at the time following your last treatment?

"A. It did."

On cross-examination Dr. Johnson testified:

"Q. What connection did you make between that alleged incident (accident) and her condition?

"A. When she strained her back she put her atlas out and the bones in the lower part of the back and caused a contraction of the muscles over the body. That is the direct connection."

Dr. C. Russell Weaver, physician and surgeon, was also called and testified in behalf of respondent, as follows:

"Q. I will ask you whether or not during April or May of the present year you examined the claimant here, Lila Golay?

"A. Yes, I did.

"Q. Will you state to the board, Doctor, the nature and extent of the examination you made of Miss Golay and what you found as a result of such examination?

"A. This examination was made May second. She came to me for an examination and I made a rather complete ex-

amination. I don't know how detailed you want this. It won't take very long for me to read this.

"Q. You might do it.

"A. She complained at that time of a weakness through hips, and thighs and calf and she dated this injury from September 27, 1937. She said she was injured at Magic Hot Springs as she stepped off a threshold. She felt her foot slip, felt herself sliding off the step and she caught herself by reaching out her arms. She felt a sudden sharp pain in the sacroiliac region and felt a pop in her spine. She found that she was bent over towards the left. . . . . Going back to the original date of the accident she was in a great deal of pain, could neither walk, stand, sit or lie in bed with comfort. . . . . Bending forward showed normal arching and no limitation of motion. Bending right caused pain on left which was greater than bending on right. She had some pain bending on right. . . . . There is tenderness over the sacroiliac joint, tenderness over the sciatic notch. Tenderness also over the course of the sciatic nerve, both right and left, more severe on left. Left calf is tender. There is tenderness over the hamstring with hips flexed. Knee rocking sign, no pain. . . . . I think that covers my record of the examination.

"Q. As I understand then, Doctor, the seat of pain was in the vicinity of the sacroiliac joint, is that it?

"A. Yes.

"Q. And also the sciatic nerve?

"A. Yes."

. . . . . . . . . . . . . .

"Q. About how long would you say, Doctor, the condition that Miss Golay disclosed at the time of your examination would be likely to last? In a person of her age and other physicial conditions?

"A. Well, I think that is a hard question to answer and I don't know that I am prepared to answer it. I know this, they last a long time. They may be very short or they may last over a period of years."

Mrs. Millie Golay, mother of respondent, testified:

"Q. Do you remember the occasion of her (the daughter) coming home last fall from Magic Hot Springs?

"A. Yes.

"Q. Along towards the end of September or the first of October?

"A. Yes, I did not know she was coming.

"Q. Do you remember she did come?

"A. Yes.

"Q. What was her condition when she came home?

"A. Well, she couldn't hardly walk.

"Q. How long did that condition last?

"A. Well, she didn't do anything I know for I don't know how many days. She was laid up with it. I took her right to the doctor. My son-in-law was doctoring with Dr. Johnson and I took her there the next day.

"Q. Did she do any work?

"A. No. I wouldn't allow her to do any work.

"Q. Did she try?

"A. She wasn't able."

Bearing in mind there is no evidence in the record respondent suffered with spinal, or any other trouble before the accident, but that after the accident her spine was badly contracted and she walked bent over on one side, establishes the greater *probability* respondent's spinal trouble was caused by the accident. (*Brooke v. Nolan, supra; Nistad v. Winton Lumber Co. et al.,* 59 Ida. 533, 85 Pac. (2d) 236; *Beaver v. Morrison-Knudsen Co.,* 55 Ida. 275, 41 Pac. (2d) 605; *Croy v. McFarland Lumber Co., supra; Larson v. Ohio Match Co., supra.*)

Moreover, and as we held in *Pierstorff v. Gray's Auto Shop, supra,* it is not necessary that a claimant prove the exact manner in which he is injured. The law does not require such certainty of proof, and to so hold would, in some cases, defeat the very purpose of the Workmen's Compensation Law.

The board found the accident in question occurred "on the evening of the twenty-seventh day of September, 1937." Appellants contend such finding is insufficient to support the award, in that the "board found only as to the place and manner of the injury," but not *when* the injury was sustained, whether at about 4:30 o'clock in the afternoon

during working hours, or at about 9 :00 o'clock at night after working hours.

The 1933 edition of Funk and Wagnalls New Standard Dictionary defines the word "evening": "1. the closing part of the day and beginning of the night; in a strict sense, from sunset till dark; in common speech, the latter part of the day and the earlier part of the night, until bed-time."

When it is remembered respondent testified the accident occurred at about 4:30 o'clock in the afternoon; and that the board found she was injured by accident arising out of and in the course of her employment, it becomes apparent the board used the word "evening" as it is used in "common speech"—to include the latter part of the day, that is to say, 4:30 o'clock in the afternoon, the time respondent testified the accident occurred. While it would have been better had the board fixed the time of the accident with more certainty, we cannot say under the circumstances, the finding is fatally insufficient.

It should be stated, in conclusion, appellants did not secure compensation to their employees, as required by sec. 43–1601, I. C. A., hence, this proceeding was prosecuted against appellants (employers) only.

From what has been said it follows the award must be *affirmed,* and it is so ordered, with costs to respondent.

Ailshie, C. J., Budge, Givens, Morgan, JJ., concur.