(No. 6722.   November 24, 1939.)

IRMA BRINK, Appellant, v. H. EARL CLACK COMPANY, a Corporation, and STATE INSURANCE FUND, Respondents.

[96 Pac. (2d) 500.]

J. Ward Arney and Clay V. Spear, for Appellant.

Clarence L. Hillman, for Respondent.

GIVENS, J.—November 13, 1938, Stanley L. Brink was, and for about a year prior thereto had been, in charge of and engaged in the distribution of gasoline by motor truck for H. Earl Clack Company, one of the defendants herein, at and from Coeur d'Alene.

The evening of the 12th, Brink, accompanied by his brother-in-law Ed. Bryan, delivered gasoline to Rose Lake, whence

returning attempting to pass a stalled automobile on a muddy and slippery road (Bryan having gotten out of the truck to see if it could be driven by the stalled automobile) the truck overturned on its top in the barrow pit rendering Brink unconscious for ten or fifteen minutes. After having been extricated from the metal cab of the truck and regaining consciousness he was returned in the stalled automobile to Rose Lake where he stayed until about midnight, continuing to be more or less dopey, his memory faulty, resting his head on his arms as he sat by a table and complaining that his head hurt and that something was rolling over it. The cafe where he was thus resting, closing at midnight, Brink and Bryan were compelled to walk about six miles to the Canyon Garage on the road to Coeur d'Alene; Brink walked in a more or less shuffling manner and still complained about his head.

Securing shelter but no bed in a house at the Canyon Garage, the two occupants thereof and Bryan went to sleep, leaving Brink sitting up and still complaining of his head.

The Industrial Accident Board's Finding of Fact No. 14 clearly details the ensuing denouement:

"That while said Brink was sitting by the said chest of drawers, the other occupants of the cabin went to sleep and the next time Brink was seen he was putting fire-wood into the stove and then sit in front of it; that later, and between five thirty and six o'clock in the morning of November 13, 1938, he was by an acquaintance seen outside of the cabin door urinating; that the said acquaintance greeted said Brink by saying, 'Hello, Brink, how's everything this morning?' and Brink answered, 'Oh, all right, I guess,' and turned and stumbled on the stoop and staggered into the door; that the next which was seen of said Brink was after the occupants of the cabin, awakened by the discharge of a rifle, found said Brink had been shot in the head with the rifle which he had taken with him in his truck from Coeur d'Alene and that he was dead of said gun shot wound."

Brink's wife, on behalf of herself and minor daughter, sought compensation.

The board found Brink did not commit suicide and that his death was not caused by intoxication, two of the defenses interposed (which therefore, we need not further consider), and denied compensation thus:

"XVIII

"Since the presumption against suicide is in the nature of evidence and is so strong and since there is nothing to overcome such presumption, except possible inferences from facts established by the testimony, and since from said facts it is just as reasonable, if not more so, to draw the inference that said gun was accidentally and not purposely discharged while Brink was handling it, and since all the testimony negatives the existence of any cause for suicide, we especially do not find that Stanley L. Brink did commit suicide and further find as a fact that there was no causal connection between the overturning of said truck on the evening of November 12, 1938 and the death of said Brink on the morning of said November 13, 1938, and that his death was not the result of his wilful intention to injure himself."

"XIX

"It is further especially found as a fact that the death of said Stanley L. Brink was not the result of a personal injury by accident arising out of and in the course of his employment with the defendant, H. Earl Clack Company."

If there is sufficient competent evidence to sustain the findings of the board, in so far as they are findings of fact, that there was no causal connection between the injury received by Brink from the accidental overturning of the truck (concededly arising in the course of and out of his employment) and the gun-shot wound which caused his death, under article 5, section 9, Idaho Constitution, as amended by H. J. R. No. 1, Session Laws 1937, page 498, we must approve the order. (*Bybee v. Idaho Equity Exchange*, 57 Ida. 396, 65 Pac. (2d) 730.)

Not only, however, does the evidence not support the finding, but it is expressly contrary thereto in this: The evidence without dispute shows that after the overturning of the truck Brink was not in the same mental condition as he was before, and as he usually was; the board having found, on ample evidence:

"That during all of the married life of the claimant and the said Stanley L. Brink they lived together happily, were congenial, he was very proud of, and affectionate towards, his said daughter, provided well for his wife and daughter, endeavored to give the daughter exceptional advantages and had made plans for her further education; that while in the employ of said Clack Company he worked from ten to more hours a day as his business required, usually six days a week, but worked occasionally on Sundays when the business required it, and took an active interest in his work and had justifiable hopes of advancement therein; that he never mentioned anything with reference to self-harm or self-destruction and that there was no apparent reason for his inflicting self-harm or self-destruction; that the accounts between him and his employer were current and on said November 12th were in good shape; that occasionally during the week he indulged in beer and intoxicating drinks but not to the extent of interfering with his work; that occasionally and sometimes on Saturday nights and holidays he indulged in such drinking convivially and sometimes to some excess; that such indulgence stimulated his conviviality to the story telling point but did not induce or cause any morbidity or any depressing tendency or act and did not change his nature as an agreeable person; that he drank in company with friends and in company with his wife and such drinking did not interfere with or detract from, his working ability, social activities or domestic happiness; that he made friends in different walks of life, was a friendly, amicable disposition and not subject to any severe disease or injury."

Conceding the gun-shot wound was accidental in that it was not committed by Brink with suicidal intent, the analysis contained in the testimony of Dr. Wood, who testified in response to a hypothetical question, that there was a causal connection, was not only rational but in harmony with the conceded facts and is not in any way gainsaid:

"A. My opinion would be that the cause of death was a brain injury sustained during the accident of the turning over of the truck.

"Q. Doctor, one question, how long had you known Stanley Brink?

"A. Oh, twenty years, maybe.

"Q. Had you ever examined him physically?

"A. Yes, several times.

"Q. For what purpose?

"A. Life insurance.

"Q. What was his physical condition and mental condition?

"A. Excellent.

. . . . . . . . . . . . . .

"Q. When was the last examination made, roughly?

"A. I am under the impression about a year before his death. I think then I examined him for New York Life Insurance.

"Q. What was his physical condition at that time?

"A. Very good. Excellent.

"Q. His mental condition?

"A. Very good.

"Q. Did you see him occasionally on the streets thereafter and around?

"A. Yes, quite occasionally.

"Q. Talk to him occasionally?

"A. Yes.

"Q. Did you notice any change in his physical and mental condition about a year prior and then?

"A. No.

"Q. Are you acquainted somewhat with his heredity?

"A. Yes.

"Q. Is that normal or abnormal?

Mr. HILLMAN: Object to that as it is not the best evidence and hearsay.

"Q. Have you a personal acquaintance with the immediate progenitors of Stanley Brink?

"A. Yes. I have attended the family quite a little.

"Q. Is that heredity normal or abnormal.

"A. I would say average, normal.

"Q. You say the probable cause of his death was the head injury, brain injury sustained in the accident, and what

in your opinion resulted thereafter? What kind of an injury did he have?

. . . . . . . . . . . . . .

"A. It would be impossible for me to say the extent of the injury. The only way I could judge there was an injury would be by the changed functions in the brain apparently, as I am taking the hypothetical question as true. He never, at any time, had a full return of consciousness; he was cloudy from the time of his injury up to the time he was last spoken to and of course one would conclude he had no massive hemorrhage or he couldn't walk or he would not have recovered consciousness or he would have again lapsed into unconsciousness, more in a speculative way I would say he had a rather severe concussion but whether he had a fracture, I don't know.

"Q. From that history, from a medical standpoint, would you say this death was the cause of unconscious suicide or not?

. . . . . . . . . . . . . .

"A. I would take it—I doubt very much from the question and what little of the evidence I heard this morning that Mr. Brink was in any condition from the time of the injury at any time to make a conscious resolve, involving anything except the regular functions of walking and breathing and having his bladder emptied."

Upon the evidence adduced the only logical conclusion to be drawn therefrom is that the discharge of the gun by Brink *accidentally,* was because his mental faculties had been deranged by the overturning of the truck. (113 Journal of American Medical Association, No. 20, Nov. 11, 1939, p. 1779 et seq., After-Effects of Head Injury, by Walter F. Schaller, M. D.) True, people accidentally shoot themselves when in full possession of all their mental acumen and physical aptness at handling firearms and no mental derangement is necessary to cause such fatalities, but here the positive undisputed evidence shows a cause, a reason, a predisposing element which cannot be ignored or thrust aside; because there is no justification for thus ignoring Brink's apparent and continuing altered mental condition, from the time of the

accident and initial injury to the lethal culmination. The causal connection is unmistakable and demands consideration. Is it not comparable to this situation by way of illustration: Suppose because of his lagging and shuffling when walking, his mental obtuseness shown by faulty memory, slowness of speech and reiteration that he felt something rolling over his head when in fact nothing was then rolling over his head, he had fallen over a cliff, stepped in front of a fast-moving automobile, would not the circumstance be such as to immediately justify the conclusion there was a compensable causal connection?

██ Not to give effect to this evidence of the previous injury is to leave the field of positive testimony and enter the realm of mere speculation. The liberal construction of the statute demanded and consistently adhered to requires that compensation be awarded. (*Hepner v. Department of Labor & Industries,* 141 Wash. 55, 250 Pac. 461; *Marriott v. Moltby Maine Colliery Co.,* (Eng.) 13 B. W. C. C. 353; *Lundy v. George Brown & Co.,* 93 N. J. L. 469, 108 Atl. 252; *In re Sponatski,* 220 Mass. 526, 108 N. E. 466, L. R. A. 1916A, 333; *Freedman v. Spicer Mfg. Co.,* 97 N. J. L. 325, 116 Atl. 427.)

Giving full credence to the answer to the question[1] asked the Coroner, Dr. Teed, based on the testimony of Bryan, does

---

[1] "Q. I will ask you if he made the statement in substance and effect concerning that happening that he was called by Brink the evening before to come up to the Canyon Garage and drive the truck, and he arrived and went with him to Rose Lake to deliver some gas and on returning from Rose Lake, about four miles above the Canyon Garage the truck stopped to assist a car stalled across the road; that Bryan got out and helped get the car off but that Brink slipped over under the steering wheel and started to drive around the car and drove off the grade and upset the car, which went off the grade with about 400 gallons of gas; that they got Brink out of the truck and back on the highway; that he seemed a little dazed but apparently recovered from that and they went back to Rose Lake and went to the saloon and had a few drinks and Brink went over to a table and slept about two hours; that they returned to the truck, thinking the wrecker would be there, but it had not come and they walked down to the cabin and about one thirty arrived there; that Brink sug-

not militate against this theory of the cause of the shooting, but (suicide being eliminated) merely adds to the conclusion that Brink had been mentally deranged by the over-turning of the truck, which contributed to it if it did not entirely cause the shooting.

In view of deceased's past history it is more probable than not that the after effect of the injury to his head received when the truck overturned contributed to the shooting, and probabilities are all that are required. (*Nistad v. Winton Lumber Co.*, 59 Ida. 533, 85 Pac. (2d) 236; *Golay v. Stoddard, ante,* p. 168, 89 Pac. (2d) 1002; *Wozniak v. Stoner Meat Co.*, 57 Ida. 439, 65 Pac. (2d) 768; *Roe v. Boise Grocery Co.*, 53 Ida. 82, 21 Pac. (2d) 910; *In re Soran,* 57 Ida. 483, 67 Pac. (2d) 906; *Suren v. Sunshine Min. Co.*, 58 Ida. 101, 70 Pac. (2d) 399; *Riley v. Boise City*, 54 Ida. 335, 31 Pac. (2d) 968; *Beaver v. Morrison-Knudsen Co.*, 55 Ida. 275, 41 Pac. (2d) 605.)

The order of the Industrial Accident Board is therefore reversed with directions to enter an award in favor of appellant.

Budge, Morgan, and Holden, JJ., concur.

Ailshie, C. J., did not sit in this case.

---

gested they each take a dose of powders and go away together; that to make another bed Bryan slept on a blanket and that Brink sat on the chair, remaining at the table and apparently going to sleep; that the others went to sleep and on—were awakened by a shot, and on awakening witnessed the scene described heretofore.

"Further that Bryan made the statement Brink had been drinking quite heavily the day before and was not in good shape to drive the truck and that Brink had been having more or less domestic trouble and that he made the remark that he guessed he would blow his brains out as they weren't any good any way.

. . . . . . . . . . . . . . .

"A. Yes.
"Q. He made that statement?
"A. Yes."