(No. 6954.   December 18, 1941)

MIKE STROSCHEIM, Appellant, v. CLYDE SHAY and IDAHO COMPENSATION COMPANY, Respondents.

(120 Pac. (2d) 267)

Paul C. Keeton and William D. Keeton, for Appellant.

Spencer Nelson and Ralph S. Nelson, for Respondents.

BUDGE, C.J.—Appellant sustained an injury by accident arising out of and in the course of his employment. Briefly stated the facts are substantially as follows.

On August 6, 1940, appellant, working for respondent Clyde Shay whose surety was the Idaho Compensation Company, while engaged in sawing a log, sustained an injury by accident. The log broke, striking appellant's left foot and causing a small fracture of the astragalus bone. As a result of said injury appellant was treated at St. Maries Hospital under a hospital contract. A claim for compensation, dated August 28, 1940, was served upon respondents on September 3, 1940. No question of medi-

cal fees is here involved. Compensation was paid by respondents to appellant at the rate of $8.65 per week from August 6, 1940, the date of the injury, until December 18, 1940, when a controversy arose as to the average weekly wages earned by appellant during the year previous to the accident and injury. A petition and an amended petition for a hearing before the Industrial Accident Board were filed on March 7 and 27, 1941, respectively. In said amended petition, it is alleged among other things:

"and claimant has further a permanent injury as follows: a trophic osteitis about the tarsal bones, and arteriosclerosis in the ankle joint and arthritis inhibiting the use and the motion of the ankle joint, causing extensive pain; that said permanent disability is equivalent to twenty-five percent of the loss of the foot above the ankle."

The matter was heard before the Industrial Accident Board on June 20, 1941. The Board made findings of fact, rulings of law, and an award in appellant's favor, allowing compensation for total temporary disability to May 20, 1941, but denied permanent disability. From which award this appeal is taken.

Appellant specifies and relies upon the following errors, namely, that the Board erred in making the following findings of fact:

"That subsequent to the 15th day of January, 1941, claimant had some pain in his said foot and he had some difficulty in walking over uneven ground; that he then visited another physician in St. Maries who prescribed an arch support for his foot which claimant wore; that commencing with the 20th day of May, 1941, claimant commenced working for the Cedar Pole Company and has worked there ever since, earning daily wages of $4.00 to $4.50; the claimant still complains of his foot bothering him when walking over rough ground and that occasionally swelling appears." (Finding No. 5.)

"That as a result of the injury by accident received on the said 6th day of August, 1940, claimant was totally temporarily disabled for work from and after the 6th day of August, 1940, to and including the 19th day of May, 1941; that on said last mentioned date all claimant's

disability for work on account of said injury ceased and he now has no permanent injury as a result of said injury by accident." (Finding No. 6.)

Furthermore:

"The Industrial Accident Board erred in not applying the law to the undisputed facts showing economic and industrial disability of claimant and making an award of a percentage of permanent disability, equivalent to the loss of the foot at the ankle as provided for in "other cases" part of I. C. A. 43-1113."

Appellant contends that from the language used by the Board in finding No. 5, it would appear that appellant returned to his usual occupation and work as he had done in the past prior to the injury; that said finding is not supported in this, that the evidence shows that due to said injury and as a result thereof, appellant was not able to work more than three or three and a half days a week; that the Board failed to find, as indisputably shown by the record, that appellant due to said accident and injury, only worked about one-half time and not continuously.

While it is true that appellant did not work every day from May 20 to June 20, 1941, it is clear from the record that appellant commenced to work for the Cedar Pole Company on May 20, 1941, and continued to work for said Company, *and no other*, up to June 20, 1941, earning a daily wage of from $4.00 to $4.50 on the days he worked. Therefore, appellant actually did work "ever since" May 20, 1941, but did not work every day.

Although the language above used is somewhat ambiguous, we are not disposed to disturb the Board's finding or to remand the case with directions to the Board to find specifically "that claimant only worked about one-half time" and did not return to his usual occupation and work. It is to be borne in mind that proceedings under the Workmen's Compensation Law are not to be governed by strict procedure, but are to be liberally construed, which rule would apply to the Board's findings of fact and the sufficiency thereof.

Appellant's second assignment of error attacks the 6th finding of fact wherein the Board found that when claim-

ant returned to work on May 20, 1941, he had no permanent disability, it being contended that said finding is not supported by competent and substantial evidence. It therefore becomes necessary to examine the record to determine whether or not there is any substantial evidence to support the Board's finding.

The Board found that subsequent to January 15, 1941, appellant had some pain in his foot and had some difficulty in walking over uneven ground; that on May 19, 1941, approximately four months later, all appellant's disability for work on account of the injury had ceased; that he had no permanent disability as a result of the injury by accident; but that he "still complains of his foot bothering him when walking over rough ground and that occasionally swelling appears." The Board evidently was not convinced that appellant had cause for pain, or that swelling did appear, for after finding as above indicated, appellant was denied any compensation for permanent disability.

Appellant testified he went to work on May 20, 1941, for the Cedar Pole Company but was only able to work about three or three and a half days a week due to pain in his foot.

Witness KICKBUSH, foreman for Cedar Pole Company, testified:

"Q. [By Mr. KEETON on direct.] Now, have you observed his physical condition on the job?

"A. Yes, he seems to have, to have trouble going to and back into camp from our work.

\*    \*    \*    \*    \*    \*    \*    \*    \*

"Q. You observed him walking, have you?

"A. Yes.

"Q. Does he or does he not limp?

\*    \*    \*    \*    \*    \*    \*    \*    \*

"A. Yes, he limps.

"Q. And has he complained to you as to pain in this left foot?

\*    \*    \*    \*    \*    \*    \*    \*    \*

"A.   Yes, he has complained.
"Q.   How often, Mr. ——?
"A.   Oh, quite often.
"Q.   Mr. Kickbush, at your camp, did he work every day or approximately how many days a week did he work?
"A.   Roughly he has worked about half-time."

Dr. PATTON examined appellant on March 19, May 15, and June 15, 1941, and testified with reference to appellant's physical condition:

"Q.   [By Mr. KEETON on direct.] When a person has a condition like that, what is your opinion as to whether or not he is able to follow a gainful occupation in the woods?
"A.   It would be pretty hard to.
"Q.   You think he could or could not?
"A.   I believe it would be pretty hard to.

\*      \*      \*      \*      \*      \*      \*      \*      \*

"Q.   [By Mr. KEETON on redirect.] Does he—does he not favor this foot?
"A.   He walks with a limp.
"Q.   Doctor, in your examination of these X-rays and your examination of the foot, and your observation of the claimant, what is the per cent of disability that Stroscheim has when compared to the loss of the foot at the ankle?

\*      \*      \*      \*      \*      \*      \*      \*      \*

"A.   Well, I would say that when I examined him, he had about 50 per cent disability in his ankle in relation to amputation at the ankle.

\*      \*      \*      \*      \*      \*      \*      \*      \*

"Q.   In your opinion it would not get well—would it get well?
"A.   It might.
"Q.   Over a long time?
"A.   Over a period of time.
"Q.   Over what period of time?
"A.   Anywheres from six months to a year and a half.

"Q. Still an improvement at that time. Would it be problematical then?

\*    \*    \*    \*    \*    \*    \*    \*    \*

"A. Well, I would say it would be problematical any time."

Dr. PEACOCK, contract doctor for employees of Clyde Shay, and to whose hospital appellant was taken immediately following the accident, testified that he rendered medical service to appellant up until January 15, 1941, when appellant was discharged as being physically able to work; that appellant returned to him during the month of January complaining of pain and swelling in his injured foot, and was thereupon further treated, until April 9, 1941, when appellant was again discharged as being physically fit for work. The Doctor testified:

"Q. [By Mr. NELSON on cross.] From your examination of this man, from your treatment, and from your examination of the X-rays state whether or not in your opinion this man has any permanent disability in his injured foot?

\*    \*    \*    \*    \*    \*    \*    \*    \*

"A. I feel there is no permanent—no indication of permanent disability at the time of the examination today.

\*    \*    \*    \*    \*    \*    \*    \*    \*

"Q. On or about January 15, of this year, what was your opinion as to whether or not this man was ready for work?

"A. At the time he was examined, we felt that he should—he should be—give himself an opportunity to work.

"Q. What exercise was he taking at that time according to what you saw or what he told you?

"A. He was walking three miles or thereabouts on level ground each day and so he stated without too much difficulty.

\*    \*    \*    \*    \*    \*    \*    \*    \*

"Q. What was the general appearance of the left foot as compared with the right foot?

"A. Comparison of the two reveal—reveal no visible difference with the exception of a small amount of new bone formation at the level of the old fracture.

\* \* \* \* \* \* \* \* \*

"Q. [Redirect by Mr. KEETON.] He wasn't able to go back to work in January, was he Doctor?

"A. It was our opinion when he first was examined that he was able to go back to work. When he came back in I suggested that he attempt to find work that he could do, give himself a chance at it, that is the only way he could find out because there was nothing further we could do for him.

\* \* \* \* \* \* \* \* \*

"Q. Is the leg well today?

"A. Objectively.

"Q. What do you mean by that?

"A. In the case I mean by my physical findings. I think he should feel that he was well enough to do his work.

\* \* \* \* \* \* \* \* \*

"Q. Doctor, you don't think that ankle of his is well today, do you?

"A. I think it is well enough for him to be employed in gainful labor.

"Q. Is it well?

"A. I should say yes.

\* \* \* \* \* \* \* \* \*

"Mr. ROBISON [Member of the Industrial Accident Board]: Doctor, has he reached a maximum improvement of which time and nature will permit in that foot?

"A. No, I believe there is a lot more in a definite period as in all cases.

"Mr. ROBISON: It is your opinion his condition will improve over a period of time?

"A. Yes.

"Mr. SUPPINGER [Member of the Industrial Accident Board]: Is he surgically healed?

"A. I should say yes.

\* \* \* \* \* \* \* \* \*

"Q. [Redirect by Mr. KEETON]: Whether or not he knew—whether or not you sent a report in didn't you make the final report that he was surgically healed as of April 9, 1941?

"A. Made a report that he was ready to go back to work. I refuse to use the statement "surgically healed."

\* \* \* \* \* \* \* \* \*

"Q. If he will continue to improve tell the Board what is the matter with him now?

"A. Well, in my opinion he hasn't returned entirely to normal of the effects of his disability; \* \* \* \* As far as the man's foot is concerned, it is my opinion that he has good healing, no demonstrable disability of the foot with the exception of pain which is—he complains which is localized over the whole fracture. Examination of the injury of the joints and of the ligaments involved doesn't lead me to believe that there is any—there is any indication of a disability which could be considered in anyway of a permanent nature.

\* \* \* \* \* \* \* \* \*

"Q. Now, you say, Doctor, you don't find any disability—any permanent disability—in this foot?

"A. From a functional basis, no.

"Q. From a working basis?

"A. I don't think so.

"Q. Can he walk as good as he can on the right foot?

"A. As far as I can tell except from his appearance of his limp.

"Q. Could he walk up hill?

"A. He absolutely could.

\* \* \* \* \* \* \* \* \*

"Q. The break didn't affect the circulation?

"A. There is no variation in temperature or color.

\* \* \* \* \* \* \* \* \*

"Q. [Cross by Mr. NELSON]: Doctor, has this man a permanent injury as follows: 'Atrophic osteitis about the tarsal bones'?

"A. No, not in the meaning of the term.

\*     \*     \*     \*     \*     \*     \*     \*     \*

"Q. Has he arteriosclerosis in the foot as exhibited by the X-rays?

"A. No.

"Q. Doctor, I don't want to go over it again but as I understand, you find that this man has no disability now or condition which would disable him from work? Is that right?

"A. I feel he could work.

"Q. Yes; and when you speak about the condition improving you refer to the fact that calcification will continue to improve or slight atrophy is shown in the left foot?

"A. I feel that the natural processing following any operations whether appendix or tonsillectomy will go on for a period of months after the person has gone back to work. That is what I am trying to offer. That is all."

Appellant contends that the testimony of Dr. Peacock that appellant was able to return to his normal work on or before May 20, 1941, and that he had no permanent disability, being the testimony of an expert medical witness, is purely advisory, therefore not sufficient to support the Board's finding No. 6. In support of such contention, appellant cites and relies upon *Nistad v. Winton Lbr. Co.*, 61 Ida. 1, 99 Pac. 2d 52, reported in 59 Ida. 533, 85 Pac. 2d 236; he also cites *Evans v. Cavanagh*, 58 Ida. 324, 73 Pac. 2d 83; *Suren v. Sunshine Min. Co.*, 58 Ida. 101, 108, 70 Pac. 2d 399, 403.

In *Nistad v. Winton Lbr. Co., supra,* the following language is used:

"The testimony of an expert as to his opinion is not evidence of a fact in dispute but is advisory, only, to assist the triers of fact to understand and apply other evidence." (Language to like effect is used in the other cases cited above.)

The facts in the instant case are not parallel to the facts

disclosed in the cases above cited in this, that in the cases cited (except in *Suren v. Sunshine Min. Co., supra*) none of the Doctors who testified as experts had ever seen or attended the injured workman. Their testimony was based upon hypothetical questions and not upon observation and treatment. In the case at bar appellant was immediately conveyed to the hospital of Dr. Peacock, who had actual knowledge of appellant's condition, having observed and treated him for his injury for over a period of months. Therefore, Dr. Peacock's testimony was largely of his own knowledge concerning appellant's condition and the extent of his recovery, during practically all of the time appellant was in the hospital and subsequent thereto up to the time of the hearing.

The weight to be given expert testimony hinges on, among other things, the expert's means of knowledge, his competency, extent of experience or study of witness, whether witness is biased, the facts upon which the opinion is based, and of course the integrity of the witness. (42 L. R. A. 753.)

In *Oliver v. Daniel Jeffrey & Sons*, La. 169 So. 247, it is held that the testimony of the physician who had been in immediate and continued contact with injured employee from time of his injury was entitled to greater weight than conflicting testimony of pathologist who rested his opinion as to cause of employee's death entirely on his examination of parts of body sent him after employee's death.

Conceding, but not deciding, that Dr. Peacock's testimony was merely advisory, its weight was for the triers of fact, the Board. As was said in *Osborn v. Carey*, 24 Ida. 158, 132 Pac. 967, when an expert gives his opinion based upon an assumed set of facts and the history of the case, the jury should give it such weight as it deserves.

There is no distinction between expert testimony and evidence of other character as regards the weight to be given it in a particular case. (*Treadwell v. Nickel*, 194 Cal. 243, 228 Pac. 25; *Rolland v. Porterfield*, 183 Cal. 466, 191 Pac. 913.) In *Langford v. Jones*, 18 Oregon 307, 22 Pac. 1064, it was held that opinions of experts on ques-

tions of medical science, though based upon hypothetical statements, are entitled to the same consideration as other direct oral testimony, when such statements are found to be real.

As was said in *Nantron v. General Tile & Marble Co.*, Mo. A. 121 S. W. 2d 246, 253:

"We regard the testimony of Dr Webb as furnishing competent and substantial evidence on which the award of the Commission denying compensation may properly rest. A medical question being involved, the testimony of one learned in that line was proper, and his opinions amounted to competent substantial evidence."

If the testimony of Dr. Webb furnished competent and sufficient evidence on which an award of the commission denying compensation may properly rest, the evidence of Dr. Peacock furnished competent and substantial evidence on which the award of the Industrial Accident Board allowing compensation for total temporary disability but no permanent disability, should be sustained.

In *Skjoldahl v. Industrial Commission, Colo.* 113 Pac. 2d 871, it is held that expert medical testimony given in a hearing before the Industrial Commission constitutes "substantial, credible evidence" which may be sufficient to support an award of the Commission. Further on in that opinion it is said:

"We believe that there is substantial and credible evidence contained in the record which supports the findings and award of the commission. We may not agree with the commission's choice of evidence to support the findings, but that is beside the question. Having in mind the required liberal interpretation and application of the Workmen's Compensation Act, it would seem to us that it would have been more in harmony with the spirit of the act had the commission adopted the testimony in behalf of claimant. Since, however, it was the province of the commission to make the choice without interference from us, and that choice is sustained by competent evidence, under the settled rule in this jurisdiction, we may not disturb its findings. Our viewpoint on this evidence is in accord with the following quotation from the brief of de-

fendants in error: "If the Industrial Commission had found as a fact that the present disability of the claimant was due to carbon monoxide poisoning, we would not question that this testimony was sufficient, credible and substantial evidence * * * *."

It may be admitted that there is a conflict in the testimony of the medical experts as to appellant's physical condition at the time of the hearing, but the findings of the Board will not be disturbed because of such conflict. (*Keck v. Wilson,* 184 Okla. 183, 85 Pac. 2d 757; *Wilhelm v. State Ind. Comm.,* 184 Okla. 17, 84 Pac. 2d 149; *Hunter v. Wm. Peper Const. Co.,* 46 Ariz. 465, 52 Pac. 2d 472.)

The Board being the triers of fact was at liberty to believe or disbelieve any witness or number of witnesses. They heard the witnesses testify and observed their demeanor while testifying, and were therefore in a much better position to determine which of the witnesses was testifying truthfully or otherwise, than is the reviewing court. (Section 9 of Article 5 of the Constitution; Code 1932, Section 43-1409 as amended by chapter 70, p. 121, 1939.

There being sufficient, competent, substantial evidence to support the Board's findings, under the well-established rule in this jurisdiction, this court will not disturb said findings, its jurisdiction being limited to review of questions of law only. (*Scarborough v. Beardmore,* 55 Ida. 229, 41 Pac. 2d 290; *Bybee v. Idaho Equity Exchange,* 57 Ida. 396, 65 Pac. 2d 730; *Vaughn v. Robertson & Thomas,* 54 Ida. 138, 29 Pac. 2d 756; *McNeil v. Panhandle Lbr. Co.,* 34 Ida. 773, 203 Pac. 1068; *Watkins v. Cavanagh,* 61 Ida. 720, 107 Pac. 2d 155; *Nistad v. Winton Lbr. Co.,* 61 Ida. 1, 4, 99 Pac. 2d 52; *Evans v. Cavanagh,* 58 Ida. 324, 331, 73 Pac. 2d 83; *Bower v. Smith,* 63 Ida. 128, 118 Pac. 2d 737, 740; *O'Neil v. Madison Lbr. Co.,* 61 Ida. 546, 551, 105 Pac. 2d 456, 459; *Knight v. Younkin,* 61 Ida. 612, 621, 105 Pac. 2d 456; *Golay v. Stoddard,* 60 Ida. 168; 89 Pac. 2d 1002; *Potter v. Realty Trust Co.,* 60 Ida. 281, 90 Pac. 2d 699; *Rand v. Lafferty Transportation Co.,* 60 Ida. 507, 92 Pac. 2d 786; *Brink v. H. Earl Clack Co.,* 60 Ida. 730, 96 Pac. 2d 500; *Totton v. Long Lake Lbr. Co.,* 61 Ida. 74, 97 Pac. 2d 596.)

In view of the disposition made of this case, it will be unnecessary to consider appellant's third assignment of error. The burden of proof rested upon appellant to establish by a preponderance of the evidence his right to recover compensation for permanent disability and this he failed to do. As was said in *Carlson v. F. H. DeAltey*, 55 Ida. 713, 724, 46 Pac. 2d 1089:

"Even though the evidence is in equipoise the appellant may not recover because the burden was on him to show a present compensable disability."

For the reasons herein stated, the award of the Board is affirmed. Costs to respondents.

Givens and Ailshie, JJ., concur.

HOLDEN, J., concurring specially.—The decisive question presented on the appeal in the instant case is: Eliminating purely expert opinion evidence—merely advisory to assist the triers of fact (*Watkins v. Cavanagh*, 61 Idaho 720, 724, 107 P. 2d 155, 156; *Nistad v. Winton Lumber Co.*, 61 Idaho 1, 4, 99 P. 2d 52, 53; *Evans v. Cavanagh*, 58 Idaho 324, 331, 73 P. 2d 83, 85;)—are the findings of the board supported by substantial, competent evidence? The record shows they are. This court is firmly committed to the rule that where the findings of the board are supported by substantial, competent evidence, they will not be disturbed. *Bower v. Smith, et al.*, 63 Idaho 128, 118 P. 2d 737, 740; *O'Neil v. Madison Lumber & Mill Co.*, 61 Idaho 546, 551, 105 P. 2d 194, 196; *Knight v. Younkin*, 61 Idaho 612, 621, 105 P. 2d 456, 459; *Golay v. Stoddard*, 60 Idaho 168, 173, 89 P. 2d 1002, 1003; *Potter v. Realty Trust Co.*, 60 Idaho 281, 289, 90 P. 2d 699, 703; *Rand v. Lafferty Transportation Co.*, 60 Idaho 507, 514, 92 P. 2d 786, 789; *Brink v. H. Earl Clack Co.*, 60 Idaho 730, 735, 96 P. 2d 500, 501; *Totton v. Long Lake Lumber Co.*, 61 Idaho 74, 79, 97 P. 2d 596, 598; Constitutional Amendment Article V, Section 9, ratified November 3, 1936; Idaho Session Laws, 1937, p. 498. Therefore, I concur.

I am authorized by Mr. Justice Morgan to say he concurs in the views herein expressed.